Raul ESPINO, Jr., a Minor, by and through his Parents and next Friends, Raul Espino and Ana Espino, Plaintiffs,

v.

Raul BESTEIRO, et al., Defendants.

Civ. A. No. B–81–176.

United States District Court,
S. D. Texas,
Brownsville Division.

Aug. 19, 1981.

**906**

Gerald Garcia, Texas Rural Legal Aid, Inc., Harlingen, Tex., for plaintiffs.

Antonio (Tony) Martinez, Horacio Barrera, Martinez & Barrera, Brownsville, Tex., for defendants.

## MEMORANDUM AND ORDER

VELA, District Judge.

This action was brought by Raul Espino, Jr., a seven year old multi-handicapped child who cannot adequately regulate his body temperature, by and through his parents, seeking declaratory and injunctive relief and damages for the alleged failure of Defendants to provide him with an education in the "least restrictive environment appropriate to his individual needs". It is alleged that the failure of Defendants to provide Raul with a fully air-conditioned classroom wherein he can interact fully with his peers, and their decision instead to provide him with an air-conditioned plexiglass cubicle within a regular non air-conditioned classroom, violate the Education for All Handicapped Children Act of 1975 (EAHCA), 20 U.S.C. §§ 1401–1420, and the regulations promulgated thereunder; the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794; and the Civil Rights Act of 1871, 42 U.S.C. § 1983. Pendent claims based on Texas statutory law are also made.

An evidentiary hearing was held on Plaintiffs' Motion for Preliminary Injunction on August 3, 1981. Based on a preponderance of the evidence, this Court is of the opinion that Plaintiffs' Motion is meritorious in that plaintiffs have demonstrated a likelihood of success on the merits of their claim under the EAHCA and its implementing regulations and have met the other requisites for equitable relief. Plaintiffs' Motion for Preliminary Injunction is therefore GRANTED in accordance with the terms of this Memorandum and Order.

## FINDINGS OF FACT

1. Raul Espino, Jr., is a seven year old multi-handicapped student at Egly Elementary School in Brownsville, Texas. During the 1981–82 academic year, he will be enrolled in the second grade at Egly.

2. Raul's handicaps result from an auto accident which occurred in 1974. At the time of the accident he was eleven months old. Raul suffered a broken spine in the cervical area, specifically at the C–5 vertebra or cervical pipe. He possibly suffered additional damage to his brain in the area of the hypothalamus.

3. As a result of the injuries sustained by Raul, he is completely paralyzed in the lower extremities. He lacks proper innervation below his elbows but has limited muscle strength in his upper arms and shoulders. He also lacks innervation in his intercostal muscles, which are used for breathing, and must use his diaphragm to compensate. Raul is medically diagnosed as a quadraplegic and is confined to a wheelchair.

4. Raul suffered damage to his sympathetic nervous system and as a result of this (and possibly as a result of a malfunctioning hypothalamus) his body cannot dissipate or conserve heat. This inability to control his temperature requires that Raul be kept

in a stable temperature controlled environment between sixty-eight and seventy-eight degrees Farenheit.

5. If Raul is subjected to excess heat, his skin turns red and he begins to hyperventilate. His internal body temperature begins to rise, often higher than his external temperature. He feels ill, restless and weak, and has difficulty concentrating. Subjection to significant variations in temperature causes Raul to accumulate mucous in his lungs and increases his susceptibility to respiratory infections.

6. Because of his condition, Raul's early childhood was spent almost entirely indoors in an air-conditioned environment between sixty-eight and seventy-two degrees. Between the late fall and early spring months, Raul is able to spend some time outside. If it gets too cold, extra clothing is able to keep Raul comfortable. (Raul has not been subjected to extreme cold temperatures during the winter because of the mild season which occurs in the Brownsville area.)

7. Because Raul had to spend much of his time indoors, he had little opportunity to interact with other children his age during his early childhood. The only child he had any prolonged contact with was his younger brother. This state of affairs continues today whenever Raul is not in school.

8. Raul's ability to control his temperature appears to be improving with age. In the last year his temperature tolerance has increased from a sixty-eight to seventy-two degree range to a sixty-eight to seventy-eight degree range.

9. As he came of age, Raul was enrolled in kindergarten at the Moody School for the Handicapped in Brownsville. The Moody school (now renamed Lincoln Park School) has fully air-conditioned classrooms and Raul had few problems with his temperature while attending kindergarten.

10. On May 7, 1980, an Admission, Review, and Dismissal (ARD) Committee of the Brownsville Independent School District (BISD) met to conduct an annual review of Raul's educational placement. The committee recommended that Raul be placed in a regular first grade classroom within the BISD and educated with non-handicapped children. The committee felt that Raul's placement at Moody was "too restrictive to meet [the] child's intellectual and social needs". The committee recommended that Raul be placed in a "air-conditioned classroom" to accommodate his needs for a stable temperature and in addition recommended other special services for him.

11. All members of the ARD Committee, including Raul's mother, Ana Leticia Espino, approved the committee's recommendation.

12. There are no air-conditioned regular classrooms in the BISD system at the elementary level. Seven classrooms at Egly Elementary which are reserved for students of the Regional School for the Deaf are air-conditioned, as are the cafeteria and the administrative offices of the school.

13. In August 1980, Raul reported with his mother to the first grade at Egly. At that time, they discovered that he was not going to be placed in an air-conditioned classroom. Instead, school officials had constructed a portable five foot by five foot plexiglass cubicle which was provided with a window air-conditioning unit and placed within a regular classroom to satisfy Raul's special needs.

14. The cubicle had been constructed and placed in the classroom without informing Raul's parents or the central ARD Committee for the BISD. Construction of the cubicle was primarily the idea of Raul Besteiro, Superintendent of the BISD. He reasoned that the air-conditioned cubicle was the best way to accommodate Raul's individual needs and give him sufficient flexibility while at the same time not air-conditioning the classroom. Besteiro felt that if the whole classroom were air-conditioned it would open up "Pandora's box" in that parents of children who would be taught in regular elementary classrooms would complain that their children were being denied the benefits of air-conditioning, as would the children's teachers. This reasoning was also shared by Mr. Hesiquio Perez, the principal at Egly Elementary. Besteiro bol-

stered his reasoning by stating that Raul did not need air-conditioning one hundred percent of the time and that furthermore, the BISD could not afford to air-condition the whole classroom. He acknowledged, however, that it would be preferable for Raul not to be in a cubicle.

15. Dr. Ronald Schraer, Director of Special Services for the BISD, felt that the cubicle was the best solution for taking care of Raul's needs, but for different reasons. While he felt that a temperature stable air-conditioned classroom would be appropriate for Raul, he thought that it would be difficult to maintain a constant temperature of sixty-eight to seventy-two degrees in an air-conditioned classroom full of children, and the cubicle was sufficient to insure quick cooling for Raul when needed. He felt that it was up to the superintendent and Special Services to implement the ARD Committee's recommendation as best they could with the resources they had. He further felt that the provision of a fully air-conditioned classroom for Raul, with its derivative benefits to his non-handicapped classmates, would violate Bulletin 871 which sets out the policies for administering the Special Education Program in the State of Texas. The Bulletin allows the use of special education funds for a specific individual handicapped child and his needs and does not refer to expenditures of funds on non-handicapped peers. (Dr. Schraer checked with the Texas Education Agency and they adhere to his interpretation of the Bulletin as he would apply it to this case.) Dr. Schraer felt that his hands were tied, and in fact, a later request by him for special education funds to air-condition classrooms for some visually handicapped students was denied. He acknowledged that there are some handicapped students at the Lincoln Park facility who are receiving air-conditioning even though it is not medically necessary for them to be in an air-conditioned environment, while some of their classmates, like Raul, do require the air-conditioning. Dr. Schraer felt that the cubicle was appropriate for Raul, in light of Raul's academic performance in the first grade, and stated that BISD was prepared to change the situation if it ever became inappropriate.

16. Before deciding on the cubicle, BISD officials investigated the possibility of placing Raul in air-conditioned classrooms at three of four private elementary schools in Brownsville, and paying for his tuition and other needed services. The three schools refused to accept Raul as a student. A fourth school was never contacted, though attempts were made to do so.

17. Raul completed the first grade at Egly Elementary with the use of the cubicle. During the month of September 1980, he spent approximately seventy-five percent of class time in the cubicle. This declined to approximately sixty percent in October and twenty-five percent in November. After spending most of his classroom time outside the cubicle during the winter and early spring, he again began spending more time in it after mid-April 1981.

18. During the school year, Raul would spend as much time outside the cubicle as his condition would allow. He would normally emerge from the cubicle to participate in the class reading assignments. His need to return to the cubicle when he became overheated often interrupted ongoing activities and cut into his interaction with fellow classmates. Raul had no physical problems and could fully interact with his peers while at lunch in the air-conditioned cafeteria at Egly. While Raul was in the cubicle, his teacher, Mrs. Maria Inez Vega, would sometimes go in there with him. Often one other child was allowed in the cubicle but this tended to cause distraction of both students. Mrs. Vega admitted that an air-conditioned classroom would make it easier for Raul to mingle with his peers.

19. Initially the cubicle had no sound system and Raul was often unable to hear his teacher until a one-way radio receiver was installed in the cubicle in December of 1980. (A transmitter was located in the classroom proper.) There were varied problems with the device caused by background noise, the loudness of the air-conditioner, interference from a radio station and Raul's

fiddling with the controls. At times it was inoperative. A new sound system has been purchased for use in the cubicle for the 1981–82 academic year.

20. Interaction and involvement with classmates is an important part of the modern educational curriculum. Dr. Emmette R. Hutto, a psychologist with a doctorate in education, testified that the cubicle is not an appropriate educational environment in that no educational principle supports such a displacement. Because of the cubicle Raul is often unable to socialize or participate in group activities with his peers. The cubicle tends to reduce Raul's ability to communicate effectively and can cut into his perception of important non-verbal stimuli from his teacher when he is listening to her over the receiver. Dr. Hutto testified that the cubicle did not represent a full educational opportunity for Raul as it isolated him and tended to call undue attention to his handicap. It further tends to remove him from an environment of stimulation and cuts him off from positive reinforcement. Placement in the cubicle cuts into Raul's ability to socialize and partake in recreational activities which is already hindered because of his condition. Dr. Hutto feels that Raul needs some sort of compensation for this lack of socialization and that this cannot be achieved in the cubicle. Despite Raul's situation, Dr. Hutto has found no evidence of any psychological or behavioral damage present in Raul.

21. Raul's grades during the 1980–81 school year were exceptional, as he made straight A's. His teacher indicated, however, that this might be due in part to the fact that much of the material they covered had already been taught to Raul the previous year at Moody School and thus was more in the nature of review material for him. Raul is apparently well liked by his classmates at Egly, and interacts well with them when he has an opportunity to do so.

22. It is possible to fully air condition a classroom at Egly Elementary which could be used by Raul until he completes the sixth grade. The cost of air-conditioning a classroom would be roughly Five Thousand Seven Hundred Dollars ($5,700.00) per year. Sectioning off an area of the classroom and partially air-conditioning it might not be an economically feasible alternative.

23. The BISD has an annual budget of approximately Thirty-nine Million Dollars ($39,000,000.00). It receives approximately Three Million Dollars ($3,000,000.00) in federal funds, of which approximately Two Hundred and Fifty Thousand Dollars ($250,000.00) are earmarked for education of the handicapped.

24. Raul's situation has received much coverage from the local and national media. One woman in Pennsylvania has offered to pay for the cost of air-conditioning Raul's classroom.

25. Since the cubicle was constructed, two window air-conditioning units have been stolen from the premises. Two units are currently kept at Egly for use with the cubicle, one of which is mounted in the mornings and removed in the afternoon, and one which is kept in reserve.

26. In November 1980, Raul's parents filed an administrative complaint challenging BISD's decision to place Raul in the cubicle and not to provide a fully air-conditioned classroom. A due process hearing was held on December 2, 1980, before an impartial hearing officer of the Texas Education Agency. The hearing officer offered a proposal for decision in BISD's favor which was adopted by the Texas Commission of Education on February 4, 1981. The Espinos administratively appealed the Commission's decision but it was affirmed on March 14, 1981, by the State Board of Education. The State Board also denied a motion for rehearing on April 11, 1981. The Espinos brought the present action for judicial review of their complaint on July 24, 1981.

27. On May 18, 1981, an ARD Committee met and formulated a new individual educational plan (IEP) for Raul to be implemented during the 1981–82 school year. It is very similar to the ARD recommendation made on May 7, 1980, with a notable exception being the requirement of an "air-conditioned environment" as opposed to an "air-

conditioned classroom". Mrs. Espino was the lone committee member dissenting from the new plan.

## CONCLUSIONS OF LAW

The Fifth Circuit standard regarding the availability of preliminary injunctive relief was enunciated in *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). Under *Callaway*, a district court, when deciding whether to grant a preliminary injunction, must consider four factors:

1.) whether Plaintiff will be irreparably harmed if the injunction does not issue;

2.) whether the Defendant will be harmed if the injunction does issue;

3.) whether the public interest would be served by the injunction; and

4.) whether Plaintiff is likely to prevail on the merits.

These four factors are best considered by an examination of the merits of Plaintiffs' claim. Since Plaintiffs have demonstrated a likelihood of success under the EAHCA, this court need not discuss nor reach the questions raised under Section 504 of the Rehabilitation Act, the Civil Rights Act, or state statutes.

I. *The Education for All Handicapped Children Act of 1975*

The EAHCA is a funding statute whereby federal grants are made available to the states to assist them in educating the handicapped. Grants are conditioned, *inter alia*, on the states:

1.) establishing "a policy that assures all handicapped children the right to a free appropriate public education",[1] 20 U.S.C. § 1412(1);

2.) establishing a plan with a goal of providing "full educational opportunities to all handicapped children", 20 U.S.C. § 1412(2)(A)(i), 45 C.F.R. § 121a.123 (1980); and

3.) implementing procedures assuring that "to the *maximum extent appropriate*, handicapped children . . . are educated with children who are not handicapped, and that special classes, separate schooling, *or other removal of handicapped children from the regular educational environment* occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services *cannot be achieved satisfactorily*", 20 U.S.C. § 1412(5)(B) (emphasis added).

Local educational agencies which receive EAHCA funds must "establish a goal of providing full educational opportunities to all handicapped children", including the provision of special services "to the *maximum extent practicable* and consistent with the provisions of § 612(5)(B) [20 U.S.C. § 1412(5)(B)]". 20 U.S.C. § 1414(a)(1)(C)(iv), 45 C.F.R. §§ 121a.222, 121a.227(a), 121a.304(a) (1980). The local agency is to further insure that "[i]n selecting the least restrictive environment,[2] consideration is given to any potential harmful effect on the child or on the quality of services which he or she needs". *Id.*, § 121a.552(d). Local agencies must establish, or revise, an individualized education program (IEP) for each handicapped child at the beginning of the school year and then review, and if appropriate, revise its provisions periodically, but not less than annually. 20 U.S.C. § 1414(a)(5), 45 C.F.R. §§ 121a.235, 121a.340–349 (1980).

---

1. The term "free appropriate public education" means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State Educational Agency, (C) include an appropriate free school, elementary, or secondary school education in the state involved, and (D) are provided in conformity with the individualized education program required under Sec-

tion 614(a)(5) [20 U.S.C. § 1414(a)(5)]. 20 U.S.C. § 1401(18).

2. The implementing regulations promulgated under Sections 1412(5)(B) and 1414(a)(1)(C)(iv) of the EAHCA are grouped under the heading "least restrictive environment", although the statute itself does not speak in these terms. 45 C.F.R. §§ 121a.132, 121a.550–121a.556 (1980). *See also* Tex.Educ.Code Ann. § 16.104 (Vernon Supp.1980).

The procedural safeguards of the EAHCA allow for presentation of complaints regarding the provision of a free appropriate public education for a child and administrative proceedings whereby such complaints are aired and a final decision thereon is reached. 20 U.S.C. § 1415. Any party aggrieved by a final administrative decision may bring an action in state or federal court for a de novo determination of the merits of his claim. *Id.,* § 1415(e)(2). The court is entitled to receive the administrative record, hear any additional evidence, and to render whatever relief it deems appropriate based on a preponderance of the evidence. *Id.* It is in such a posture that the present case is before this court, the Plaintiffs having exhausted their administrative remedies [3] and failed to obtain a favorable determination on their claim.

## II. *Likelihood of success on the merits*

The EAHCA is a remedial statute and should be broadly applied and liberally construed in favor of providing an appropriate education to handicapped students. *S–1 v. Turlington,* 635 F.2d 342, 347 (5th Cir. 1981). The problem before this court can thus be stated in relatively simple terms—is Raul Espino, Jr. being provided with an "appropriate education" under the EAHCA? For the reasons set forth below, this court feels that Plaintiffs have demonstrated that they are likely to prevail on their contention that Raul is not being provided with an appropriate education.

The "mainstreaming" provisions of the EAHCA, as set out previously, require that a handicapped child be educated with his non-handicapped peers "to the maximum extent appropriate" and that any removal from the regular educational environment occurs only when the nature of the handicap is such that education in regular classes with the use of supplementary aids "cannot be achieved satisfactorily". 20 U.S.C. § 1412(5)(B). *See Tatro v. Texas,* 625 F.2d 557, 561 (5th Cir. 1980). In the case at bar, it is undisputed that air-conditioning is a supplementary aid or "related service" which Raul Espino, Jr. needs in order to be able to attend school during the hotter months of the year. There is no evidence to suggest that a fully air-conditioned environment would be inappropriate for Raul's educational needs. There is also no evidence which suggests that a regular classroom at Egly Elementary cannot be satisfactorily modified to provide such an environment. In this set of circumstances it seems self evident that the decision to provide air-conditioning for Raul in a plexiglass cubicle, and therefore at times segregate him from his non-handicapped classmates, is prima facie a violation of the mainstreaming provisions of the EAHCA.[4]

Assuming that Raul's placement in the cubicle is not to the "maximum extent appropriate", the analysis then must focus on whether it is a reasonably appropriate accommodation in that it provides for Raul's special needs "to the maximum extent practicable" and consistent with the main-

---

3. While Plaintiffs filed their administrative complaint with respect to the failure of BISD to fully implement the recommendations of the ARD Committee for the 1980–81 school year, their contentions have not become moot with respect to judicial review because of the formulation of a new IEP for 1981–82. If an action is allowed to become moot at the end of each school year and initiation of new administrative proceedings necessitated because of formulation and implementation of a new IEP which is objectionable to Plaintiffs, the conduct complained of would be "capable of repetition, yet evading review". The Supreme Court has recognized this type of situation as an exception to the Mootness Doctrine. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 534 (1976). In a case where jurisdic-

tion is properly predicated on 20 U.S.C. § 1415, the Court is empowered to grant "such relief as ... is appropriate", *Id.,* § 1415(e)(2), which would include injunctive relief beyond the school year at issue. *Selelyo v. Drury,* 508 F.Supp. 122, 126–28 (S.D.Ohio 1980); *Rowley v. Board of Education (Rowley II),* 483 F.Supp. 536, 538 (S.D.N.Y.1980).

4. Because the facts allow this Court to make a prima facie determination that Defendants have failed to "mainstream" Raul Espino, Jr. "to the maximum extent appropriate", the case need not be analyzed in terms of whether he is being denied an education in the "least restrictive environment" as is contemplated by the regulations.

streaming provisions of the Act. 20 U.S.C. § 1414(a)(1)(C)(iv). One court has suggested that the important personal needs of an individual handicapped child must be balanced against the realities of limited funding in reaching a reasonable accommodation. *Pinkerton v. Moye,* 509 F.Supp. 107, 112–13 (W.D.Va.1981). At least one commentator has recognized that "appropriate" cannot mean the best possible education a school can provide if given access to unlimited funds, but that the EAHCA contemplates a standard between the best education and merely opening the doors of a regular classroom to those capable of learning without special assistance. Note, *Enforcing the Right to An "Appropriate" Education: The Education for All Handicapped Children Act of 1975,* 92 Harv.L.Rev. 1103, 1125 (1979). *See also, Pinkerton, supra,* at 113. Defendants in this case have not made a serious contention that maintaining a fully air-conditioned environment for Raul is prohibited by the financial condition of the BISD. The evidence presented suggests that the cost of air-conditioning a classroom would be minimal in relation to the amount of federal funds received by BISD and BISD's total budget. Balancing the important needs of Raul Espino, Jr. for an air-conditioned environment within which he can be effectively mainstreamed and interact fully with non-handicapped students, against the cost to BISD of providing him with such an environment, it cannot be said that the provision of an air-conditioned cubicle, with its concomitant isolative effect on Raul when it is being used, represents a reasonable accommodation resulting from the fiscal impracticability of providing air-conditioning for him to the maximum extent appropriate.

Realizing that the concept of "practicability" is not necessarily limited to monetary considerations, this court must analyze the other reasons advanced for the existence of the cubicle to determine whether it presents a reasonably appropriate accommodation. Superintendent Besteiro felt that a fully air-conditioned classroom for Raul's class might open "Pandora's box" in that parents of children in non-air-conditioned classrooms and the children's teachers would complain of unequal treatment in that one teacher and Raul's classmates would receive the benefits of air-conditioning during the hot months of the school year. Yet, Mr. Besteiro testified that he had received no official requests seeking air-conditioning for students other than Raul. A purely theoretical risk of parental or teacher complaints is probably insufficient to offset the countervailing needs of Raul Espino, Jr. for an education with his peers "to the maximum extent appropriate" and does not substantially justify segregation from his classmates in the cubicle. See *New York State Ass'n for Retarded Children, Inc. v. Carey,* 466 F.Supp. 487, 503 (E.D.N.Y.1979). The same rationale applies to Dr. Schraer's reasoning that he thought it would be difficult to maintain a stable temperature for Raul in an air-conditioned classroom full of children. (This argument is further weakened by the fact that Raul has experienced no difficulty in the school's air-conditioned cafeteria while attending lunch with other students and by the fact that Raul is now able to tolerate a higher range of temperature variance.)

Dr. Schraer additionally felt that provision of an air-conditioned classroom for Raul and its derivative benefits to his non-handicapped classmates would violate Bulletin 871 of the state's Special Education Program, since it allows the use of funds for a specific handicapped child but does not refer to expenditures of funds on non-handicapped children. The evidence indicates that at institutions like the Lincoln Park School, the state allows handicapped children who do not medically need air-conditioning. (e. g.—the mentally retarded) to derive its benefits from classmates who do need it. The evidence also indicated that Bulletin 871 does not allow for the expenditure of special education funds on air-conditioning for visually handicapped students who do not need it for medical reasons. Yet, the Regional School for the Deaf, who students presumably have no medical need for air-conditioning, is provided with an air-conditioned classroom. In this state of af-

fairs it is by no means clear that it would necessarily violate the Bulletin if Raul's non-handicapped classmates would derive benefits from funds expended for Raul's legitimate medical needs, and such a rationale is probably insufficient to justify placement of Raul in a cubicle. (It must be noted that the EAHCA gives courts broad authority to prescribe details of educational policy in individual cases, and a Judge can presumably order implementation of whatever program he or she deems appropriate. 20 U.S.C. § 1415(e)(2). A state's autonomy in regulating the education of its handicapped children is thus to a great extent fettered by the conditions imposed upon it due to the receipt of EAHCA funds.)

Finally, in retrospective, Dr. Schraer feels that Raul's sterling performance in the first grade proves that he is being provided with an appropriate education. While there is no question that Raul's grades establish that he is receiving an "adequate" education, this does not necessarily mean that he is receiving an "appropriate" education. One court has held that an "appropriate" education is one which lies between the extremes of a merely adequate education (*i. e.,* one that is substantial enough to facilitate a child's progress from grade to grade) and one which enables a handicapped child to achieve his or her full potential. *Rowley v. Board of Education (Rowley I),* 483 F.Supp. 528, 534 (S.D.N.Y.1980). The *Rowley I* Court found that the appropriate standard would require that each handicapped child be given an opportunity to achieve his or her full potential commensurate with the opportunity provided to other children.[5] *Id. See also Springdale School Dist. v. Grace,* 494 F.Supp. 266, 272 (W.D.Ark.1980). It is apparent that Raul misses out on a great deal of class interaction and group participation while he is confined to the cubicle.

This is of particular significance in Raul's case since the ARD committee which decided to mainstream Raul felt that the Moody facility was "too restrictive" to meet his "intellectual and social needs". Full social interaction is an important part of today's educational curriculum and is even more vital to a child like Raul who necessarily suffers a certain degree of isolation as a result of his handicap. While it is true that Raul's scholarship is superb and he displays no psychological damage as a result of his semi-isolation in the cubicle, he derives no educational benefits from it. Under the circumstances it is doubtful that Raul is being provided an opportunity for maximization of his social interaction skills commensurate with that provided to other students in his class. Raul's excellent academic performance and his ability to get along with his classmates attest to his courage and tenacity, and he should not be penalized for the fruits of his own efforts. For these reasons this Court feels that the placement of Raul in the cubicle may deprive him of a full educational opportunity and may not be in conformity with his IEP as originally espoused in the ARD committee's original report. If this indeed is the case, Raul is not being provided with an "appropriate" education under the EAHCA.

### III. *Irreparable injury, harm to Defendants, and the public interest*

As is previously noted, Raul is deprived of the opportunity to interact fully with his peers and thus is deprived of the benefits derived from such activities while he is confined to the cubicle. If he is required to continue use of the cubicle he will lose more opportunities to further his social development. This type of loss cannot be compensated for by money damages, and therefore amounts to irreparable harm. Granting

---

**5.** The *Rowley I* court felt that this standard would be "more in keeping with the regulations, with the Equal Protection decisions which motivated the passage of the Act, and common sense." *Rowley I, supra,* at 534. (It must be noted that the EAHCA was enacted in order to establish a legal mechanism which insures "maximum benefits" to handicapped children from provisions of earlier federal legislation enacted in their behalf. S.Rep. 94–168, 94th Cong. 1st Sess., [1975] U.S.Code Cong. & Ad.News 1425, 1430. *See Stemple v. Board of Education,* 623 F.2d 893, 896 (4th Cir. 1980) *cert. denied* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981).)

preliminary relief here will cut to a minimum the days of educational and social progress Raul will lose. *See Monahan v. Nebraska*, 491 F.Supp. 1074, 1094 (D.Neb. 1980). Any countervailing harm to Defendants in providing Raul with an appropriate education is minimal as far as costs are concerned and is insufficient to prevent granting of a preliminary injunction. Additionally, removal of the cubicle may result in some administrative headaches and difficult decisions for Defendants, but these are also insufficient to warrant denial of preliminary relief. Finally, the public interest is served whenever a handicapped child is given an appropriate public education. An appropriate education serves to increase the independence of the handicapped and to keep them from ever becoming public charges. *Armstrong v. Kline*, 476 F.Supp. 583, 603–04 (E.D.Pa.1979). It also serves the national interest in assuring to handicapped children the equal protection of the law.

Any Finding of Fact which constitutes a Conclusion of Law shall be deemed such. Any Conclusion of Law which constitutes a Finding of Fact shall be deemed such. For the reasons set forth above, this Court feels that the requisites for injunctive relief have been met by Plaintiffs, and therefore their Motion for Preliminary Injunction is GRANTED and it is hereby;

DECLARED that Defendants have the responsibility and the ability to provide Plaintiff Raul Espino, Jr. with an appropriate education commensurate with that provided to his non-handicapped peers under 20 U.S.C. § 1401 *et seq.*; and it is

ORDERED that pending further order of this Court Defendants are hereby enjoined from further denying Plaintiff, Raul Espino, Jr. a free appropriate education in violation of 20 U.S.C. § 1401 *et seq.* by refusing to provide him with an air-conditioned environment wherein he can fully interact with his non-handicapped peers and obtain social and educational benefits commensurate with that provided to non-handicapped students; and it is further

ORDERED that pending further order of this Court Defendants are hereby enjoined from requiring Plaintiff, Raul Espino, Jr. to attend class in an air-conditioned cubicle or any other segregated environment; and it is further

ORDERED that Defendants have a reasonable time to comply with this Memorandum and Order, which in no event shall exceed thirty days from the date of filing; and it is further

ORDERED that this order is contingent upon the posting by Plaintiffs of a bond in the amount of One Thousand Dollars ($1,000.00).

The Court notes that under the EAHCA the BISD is obligated to establish a goal of providing full educational opportunities to all handicapped children. 20 U.S.C. § 1414(a)(1)(C)(iv). The decision to remove Raul from Moody School and to educate him with non-handicapped students was a genuine effort to meet his specific educational and social needs. Once the decision to mainstream Raul was made, it triggered the statutory duty of the BISD to provide him with a full educational opportunity to the maximum extent practicable. The conduct of the Defendants in this case, including their proposed solution to the situation, was a good faith attempt to discharge their responsibilities under the Act. Their only fault lay in their perspective, which focused on the limitations of BISD's physical plant and a pessimistic view of human nature rather than on the specific needs of Raul Espino, Jr. If handicapped children are ever to become useful, productive citizens, they must be given an opportunity to experience the world they inhabit. With the possible exception of a child whose immunological system requires that he or she be kept within a sterile atmosphere, education within a cubicle will hardly ever be appropriate.