Liberata DIATTA, et al., Plaintiffs,

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**No. CIV.A.03–2653 (RCL).**

United States District Court, District of Columbia.

June 1, 2004.

---

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

Before the Court is the Plaintiffs' Motion for Summary Judgment [17], the Defendants' Motion for Summary Judgment [18], and the Plaintiffs' Motion for Preliminary Injunction [9].

Upon consideration of the motion papers, the applicable law and the record in this case, the Court will grant the Plaintiffs' Motion for Summary Judgment [17], deny the Defendants' Motion for Summary Judgment [18], and deny as moot the Plaintiffs' Motion for Preliminary Injunction [9].

*BACKGROUND*

Pursuant to the Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. § 1400 *et seq.*, the plaintiffs filed the instant action on December 30, 2003, appealing from a hearing officer's determination.

At issue is the education of Alex Keita, an autistic child currently attending Barnard Elementary School in Washington, D.C. Alex, born May 20, 1997, lives with his mother, Liberata Diatta, in the District of Columbia. At about one year of age, Alex began to exhibit autistic symptoms, including loss of language, decreased interest in social interaction and disruptive behavior. In the Fall of 1999, Alex's Head Start teacher became concerned about his lack of participation in class, listlessness and language delays, and referred Alex for psychological evaluation. Dr. Sheryl Frank evaluated Alex between December 1999 and March 2000, and issued a report diagnosing him with a form of autism recognized under the IDEA. Dr. Frank's diagnosis was later confirmed by evaluations requested by the District of Columbia Public Schools ("DCPS") Early Intervention Program and performed at Children's

Robert I. Berlow, Crownsville, MD, for Plaintiffs.

Urenthea McQuinn, Office of the Corportaion Counsel, Washington, DC, for Defendants.

Hospital National Medical Center. All who evaluated Alex agreed that his condition required a therapeutic preschool program that included language enrichment, a low student-teacher ratio, and teachers trained to handle children with autism. The report of a Dr. Penny Glass directed Alex to attend the National Child Daycare Center in D.C. when he turned three years of age, and that DCPS develop an "individualized education program" ("IEP") as soon as arrangements were made at the National Child Daycare Center. DCPS held a meeting to plan for Alex's education on June 27, 2000. However, it is unclear whether anyone from the Early Intervention Program was present at the meeting.

On July 19, 2000, Ms. Diatta enrolled Alex in the Head Start program at his neighborhood school, and although she provided the required health forms in July 2000, Alex was not observed again until October 2000 when a DCPS psychologist, Grace Chen, evaluated him. Dr. Chen's evaluation of Alex referenced Dr. Frank's report and diagnosis, but concluded that "Alex presented as a youngster with significant developmental delays." DCPS developed an IEP for Alex on November 20, 2000. However, the November 2000 IEP classified Alex as speech language impaired despite the confirmed diagnosis of Dr. Frank, and, therefore, the IEP did not include a behavior management program. Subsequent IEP's developed in 2001, 2002 and 2003 also failed to include behavior management plans even though Alex continued to exhibit the behaviors symptomatic of autism that lead to his initial evaluation and diagnosis in 1999. Alex remained in the Head Start program until DCPS transferred him to Hyde Elementary School in September 2001 where he remained until the Summer of 2003. In the Summer of 2003, Alex was placed at Barnard Elementary School, which did not have an autism program until September

2003. When the autism program at Barnard Elementary School began in September 2003, Alex was placed in the program where he remains to this day.

Three administrative hearings were held in October and November of 2003. On Alex's behalf, the plaintiffs offered the testimony of Carol A. Kamara, Ph.D., Speech–Language Pathologist, Patricia Gates Ulanet, Child Clinical Psychologist at Children's National Medical Center, Sheila C. Iseman, Student Education Advocate, and Ms. Diatta, Alex's mother. The three expert witnesses testified that Alex should have been in full-time therapeutic placement as prescribed by Dr. Frank in 1999 and 2000; that the 2001, 2002, and 2003 IEPs were inappropriate for lack of behavior management programs; that behavior management programs were essential to Alex's education; that failure to provide behavior management programs exacerbated Alex's conditions and "interfering" behaviors; that Alex had made no progress in the last three years; and that the longer that Alex is denied an appropriate education program the worse his behaviors will become, increasing the likelihood that he will need to be placed at a residential treatment facility. Plaintiffs' expert witnesses also testified that Alex now needs an intensive forty hours per week, fifty-two weeks per year Applied Behavior Analysis ("ABA") program provided in school and at home by specially trained individuals.

The defendants maintained that Alex's placement and program at Barnard Elementary School was appropriate. They presented the testimony of Anna Bowman, DCPS Clinical Social Worker, Susan Ford Robinson, DCPS Speech–Language Pathologist, Anne Jenkins, Hyde Elementary School Principal, Gerald Hirai, Hyde ES Special Education Teacher, and Karen D. Griffin, DCPS Acting Executive Director

of Programs Unit. The defendants presented no witnesses from Barnard Elementary School to testify about its new autism program or Alex's progress in it.

On December 2, 2003, the hearing officer issued findings and a determination. The HO found that: (1) "DCPS did not comply with the IDEA and denied Alex a [Free and Appropriate Public Education] when it failed to provide him an appropriate disability classification, IEP, placement and [Extended School Year Services]"; (2) Alex had been denied FAPE during the 2001–2002, 2002–2003, 2003–2004 school years and the 2003 summer session; (3) compensatory relief was due only from November 20, 2000, and made no findings regarding the period from May 20, 2000 through November 20, 2000; (4) Alex's current placement at Barnard Elementary School was inappropriate, did not meet Alex's needs and must be changed because "[b]ased on the testimony of all DCPS witnesses, there is no record evidence that Alex's [current] teacher and Dedicated Aide are trained in Autism. Nor is there any record evidence that Barnard ES has or can implement Alex's current IEP" and because "DCPS failed to provide any record evidence that the education provided Alex at Barnard ES is reasonably calculated to enable him to receive educational benefit."

However, after making the aforementioned findings and being presented with unrefuted testimony from the plaintiffs' expert witnesses that ABA is the only therapy that can effectively address Alex's exacerbated autistic disorder, the hearing officer found the compensatory education requested by the plaintiffs "beyond the reach of the IDEA," and declined to order the defendants to pay for three years of ABA, finding that he lacked authority, under *Board of Educ. Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 200, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), to implement the ABA plan requested by the plaintiffs. The hearing officer then instructed the defendants' employees to hold a meeting by January 15, 2004 to revise Alex's IEP, propose placement, and "decide the amount and means of delivering the [c]ompensatory [e]ducation award." On January 16, 2004, the defendants reassigned Alex to the Barnard Elementary School program that the hearing officer had determined to be inappropriate and a denial of FAPE in violation of the Act.

The plaintiffs move the Court for summary judgment, maintaining that the hearing officer improperly denied Alex the compensatory education that he needs, improperly limited the period for accrual during which Alex was denied FAPE, and unlawfully delegated his authority to determine appropriate relief to employees of the defendants. Plaintiffs move this Court to reverse the hearing officer's determination and order the defendants to pay for the one-on-one ABA program within 30 days of the submission of any and all invoices from the providers of ABA training, consultation and monitoring, including costs for the initial creation of an ABA program for Alex, periodic review and adjustment of that program, seminars for training therapists and Ms. Diatta, and the fees charged by the therapist for training, follow-up seminars and meetings, and direct provision to Alex of one-on-one ABA service therapy for 40 hours per week and any other reasonable costs and fees that are necessary for the provision of these services.

The defendants oppose the plaintiffs' motion and cross-move for summary judgment, maintaining that the plaintiffs are not aggrieved parties under the statute, and, therefore, may not maintain an action under the IDEA. The defendants also

maintain that the plaintiff parent cannot demand a specific educational methodology, that the hearing officer's delegation to the Bi–Level Multi-disciplinary Team was not improper under the Act, and that his finding that compensatory education should accrue from November 20, 2000 was reasonable.

## APPLICABLE LAW

### I. Summary Judgment

Pursuant to Fed.R.Civ.P. 56, summary judgment is appropriate when the motion papers, affidavits, and other submitted evidence demonstrate that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Here, both parties move for summary judgment on the pleadings and submissions, contending that there are no genuine issues of material fact in dispute, and that they are, respectively, entitled to judgment as a matter of law.

### II. Individuals with Disabilities Education Act

The IDEA "confers upon disabled students an enforceable substantive right to public education ... and conditions federal financial assistance upon a State's compliance with the substantive and procedural goals of the Act." Honig v. John Doe, 484 U.S. 305, 310, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).[1] The substantive goal of the IDEA is to ensure that all children with disabilities have available to them free appropriate public education that emphasizes special education and re-

lated services designed to meet their unique needs and prepare them for employment and independent living. See 20 U.S.C. § 1400(a)(1). Pursuant to the Act every "child with a disability," 20 U.S.C. § 1401(3)(A)-(B), is entitled to "free appropriate public education" ("FAPE"), 20 U.S.C. 1412(a)(1), including specialized education programs that are designed to effectively meet the unique circumstance of every learning disabled child. See Bd. of Educ. Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); Harris v. District of Columbia, 1992 WL 205103, *2 (D.D.C.1992); Smith v. Indianapolis Public Schools, 916 F.Supp. 872, 875 (S.D.Ind.1995). Given its broad educational objectives and specific prescriptions, the IDEA should be liberally applied and construed in favor of meeting its goals of providing appropriate and effective education to children with disabilities. See Espino v. Besteiro, 520 F.Supp. 905, 911 (S.D.Tex.1981) (citing S–1 v. Turlington, 635 F.2d 342, 347 (5th Cir.1981)).

The IDEA requires that all states receiving federal assistance under the Act: (1) provide FAPE to all children in the state between the ages of 3 and 21; (2) establish a goal of providing full educational opportunity to children with disabilities and a detailed timetable for accomplishing that goal; (3) regardless of the severity of the disability, identify, locate, evaluate, develop, provide and implement practical remedial measures to children who are in need of special education and related services; (4) provide an individualized education program ("IEP"), or an individualized family service plan that

---

1. Although Honig interprets provisions of the Education of the Handicapped Act ("EHA"), 20 U.S.C. 1400 et seq., the EHA was reenacted in 1990 as the Individuals with Disabilities Education Act and law interpreting the

former is applicable to the latter. See Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 391, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

meets the requirements of [1436(d) ] that is *developed, reviewed, and revised to meet the changing needs of the child;* (5) provide remedial education in the least restrictive environment, i.e., with children who are not learning disabled; and (6) provide additional requirements that do not otherwise violate this Act. *See* 20 U.S.C. § 1412(a)(1)-(5).

The heart of the IDEA is the IEP. *See Honig,* 484 U.S. at 311, 108 S.Ct. 592 (describing the IEP as the "primary vehicle" and "centerpiece of the statute's education delivery system"). The Act requires development of an IEP by a team that includes the child's parent(s), teachers, other educational professionals and agency representatives with authority to commit agency resources. *See* 20 U.S.C. § 1414(d)(1)(A), (B); 34 C.F.R. §§ 300.343—300.347. The developed IEP must include a written statement of evaluation and plan of action that sets forth the child's present level of educational performance, measurable goals, including benchmarks or short-term objectives, special education and related services to be provided to the child and the program modifications or supports for school personnel that will be provided to the child, the child's ability to interact with nondisabled children, a statement of administrative modification, the projected date for the beginning of services, and the anticipated frequency, location and duration of those services, and how the child's progress toward the annual goals will be measured. *See* 20 U.S.C. § 1414(d)(1)(A)(i)-(vi), (viii).

The IDEA also grants parents broad procedural rights to enforce the provisions of the Act. *See Honig,* 484 U.S. at 310, 108 S.Ct. 592. Where a parent feels that the school system has failed to provide FAPE pursuant to the requirements of the IDEA, that parent may request an administrative impartial due process hearing. *See* 20 U.S.C. § 1415(f). *See also Harris,* 1992 WL 205103, at *2. In the interest of impartiality, the due process hearing may not be conducted by an employee of the state involved in the education or care of the child. *See* 20 U.S.C. § 1415(f)(3). Rather, the hearing must be conducted by an independent hearing officer, who is charged with rendering a final decision on the matter. *See* 20 U.S.C. § 1415(i)(1)(A). Any party aggrieved by the findings or decision of the hearing officer may file a civil suit seeking judicial review of the hearing officer's decision in a federal district court. *See* 20 U.S.C. § 1415(i)(2)(A). A party is considered "aggrieved" under the Act where relief requested in satisfaction of the Act is denied. *See Harris,* 1992 WL 205103, at *2; *Diamond v. McKenzie,* 602 F.Supp. 632, 635 (D.D.C.1985) (finding that plaintiffs were aggrieved within the meaning of the Education of the Handicapped Act, by a hearing officer's findings and decision where the plaintiffs requested residential placement and the HO declined to direct the residential placement after concluding that she did not have authority to do so); *Chris D. v. Montgomery County Bd. of Educ.,* 753 F.Supp. 922, 927 (M.D.Ala.1990) (finding aggrieved within the meaning of the Education and of the Handicapped Act parents of an emotionally disabled student who did not receive all of the relief that they requested at the due process hearing); *Slack v. State of Del. Dept. of Public Instruction,* 826 F.Supp. 115, 120 (D.Del. 1993) (same).

Pursuant to § 1415(e), a court has remedial authority under the Act, and broad discretion to grant "appropriate" relief under the IDEA as guided by the goals of the Act. *See Sch. Comm. of Burlington v. Mass. Dept. of Educ.,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385

(1985). A court reviewing a hearing officer's determinations must review the records of the administrative hearings and may hear additional evidence upon party request. *See* 20 U.S.C. § 1415(i)(2)(B). A court must give due weight to the administrative proceedings, see *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034, as well as deference, although less than that conventionally granted, to the findings of the hearing officer. *See Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988). *See also Leonard v. McKenzie,* 869 F.2d 1558, 1561 (D.C.Cir.1989).

■■■ In determining whether to reverse a hearing officer's determination, the reviewing court must apply the two-prong test established in *Rowley. See Rowley,* 458 U.S. at 206, 102 S.Ct. 3034. First, the court must determine whether the state has complied with the procedural requirements of the IDEA. *See id.* Second, the court must determine whether the IEP developed by the state is reasonably calculated to enable the child to receive educational benefits. *See id.* If the court determines that the state has not met the *Rowley* test, then the court may "basing its decision on the preponderance of the evidence, [ ] grant such relief as the court determines is appropriate." *See* 20 U.S.C. § 1415(i)(2)(B)(iii). Federal courts have interpreted "appropriate relief" to include compensatory education as an equitable remedy to be granted upon finding that a child has been denied FAPE under the Act. *See Walker v. District of Columbia,* 157 F.Supp.2d 11, 30 (D.D.C.2001); *Harris,* 1992 WL at 205103, at *3; *Hammond v. District of Columbia,* 2001 WL 34360429, *6 (D.D.C.); *Hall v. Knott Cty. Bd. of Educ.,* 941 F.2d 402, 407 (6th Cir. 1991); *Miener v. Missouri,* 800 F.2d 749, 753 (8th Cir.1986). The right to compensatory education that results from a denial of FAPE beings to accrue when the school

district knew or should have known that a disabled student was receiving an inappropriate education. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 250 (3rd Cir.1999). A court has broad discretion under the Act to fashion appropriate relief that meets the unique circumstances of the case. *See Burlington,* 471 U.S. at 369, 105 S.Ct. 1996.

## ANALYSIS

In the instant matter, there is no dispute that Alex has been denied FAPE, and is both deserving and in need of immediate implementation of an appropriate educational plan. Now before the Court are questions of standing and remedy.

### I. *Standing*

■■■ The plaintiffs have standing as "aggrieved" parties under the IDEA to bring the instant suit invoking their rights under the Act. The defendants assert that the plaintiffs are not "aggrieved" parties under the Act because the hearing officer made some findings in their favor, namely that Alex has been denied FAPE since November 20, 2000 and that his placement in the Barnard Elementary School program constitutes an inappropriate denial of FAPE. However, contrary to the defendants' assertion, the plaintiffs are aggrieved parties within the meaning of the Act because the totality of the hearing officer's findings and determinations constitute denial of FAPE to Alex.

Here, where the plaintiffs maintained in the administrative proceedings that relief due from the denial of FAPE began to accrue on May 20, 2000, the plaintiffs were aggrieved by the hearing officer's determination that relief was due only from November 20, 2000. The plaintiffs were also aggrieved by the hearing officer's findings that the compensatory education program required to adequately ad-

dress Alex's educational disabilities was "beyond the reach of the IDEA," and that he lacked authority, under *Rowley,* to implement the plan requested by the plaintiffs. *See Diamond,* 602 F.Supp. at 635. The plaintiffs were further aggrieved when after determining that Alex had been denied FAPE from 2000 to the present and that his placement at Barnard Elementary School was inappropriate, the hearing officer's inaction resulted in Alex's reassignment to the Barnard Elementary School program determined to be a denial of FAPE under the Act. *See Helms v. McDaniel,* 657 F.2d 800, 804–05 (5th Cir. 1981) (holding that to appoint a hearing officer to preside over an IEP complaint brought by the parent of a handicapped child and then treat his report only as a "recommendation" violates the requirement that a hearing officer's decision be final, lest appeal). To find otherwise would run afoul of the broad procedural rights granted by the Act, as well as its educational promise to children like Alex.

Section 1415(f) of the Act grants parents the right to request an impartial due process hearing upon complaint relating to the "identification, evaluation, or educational placement of the child, or the provision of free appropriate public education" to their child. *See* 20 U.S.C. § 1415(b)(6). If unsatisfied with the findings or determinations made at the administrative level, § 1415(i) grants the aggrieved parent to right to appeal to a federal district court. If parents and children were divested of the ability to seek judicial review of a hearing officer's determination in cases where the hearing officer made some findings in favor of the plaintiffs that were rendered nullities by other improper findings or inaction, then the grant of broad procedural rights conferred by § 1415(f) would be hollow and the judicial remedy offered by § 1415(i) would be a dead letter in cases where there was a continuing

dispute over the provision of FAPE to a child in need. The defendants' position in practice would allow the hearing officer to find that Alex's placement at Barnard Elementary School did not meet his needs and must be changed because it denied him FAPE, yet do nothing to remedy the situation, and then leave him without judicial recourse. Given the broad procedural and substantive rights granted by the Act, *see Honig,* 484 U.S. at 310, 108 S.Ct. 592, this could not have been the intent of Congress. Therefore, this Court finds that the plaintiffs are aggrieved within the meaning of the Act, and, as such, able to maintain the instant action.

## II. *Compensatory Education*

■ The hearing officer's denial of the education program requested by the plaintiffs for lack of authority under *Rowley* was incorrect as a matter of law, and, in light of the administrative record, the DCPS is hereby ordered to implement the ABA program as requested by the plaintiffs.

The hearing officer had authority to grant the requested compensatory education and failed to execute his duties under the Act when he abdicated his power to order the educational program supported by the record evidence as requested by the plaintiffs. Contrary to the hearing officer's findings and the defendants' assertion, the hearing officer's ability to fashion a remedy adequate to meet Alex's current and remedial educational needs was not limited by the Supreme Court's ruling in *Rowley,* an admittedly narrow decision, *see Rowley,* 458 U.S. at 202, 102 S.Ct. 3034, that is readily distinguishable from the instant case.

In *Rowley,* the Supreme Court held that the FAPE requirement is satisfied when a child receives "some educational benefit."

*See id* at 200, 102 S.Ct. 3034. The Court further held that the Act did not require states to maximize the potential of handicapped students commensurate with non-handicapped students, and that in light of finding·that the deaf child at issue performed better than the average child in her class, advanced in grade with ease, and received personalized instruction and related services that were calculated to meet her educational needs, the Act did not require the school system to provide·the additional service of a sign-language interpreter. *See id* at 198, 203, 210, 102 S.Ct. 3034.

Similar to the instant case, *Rowley* addressed the issue of whether a young disabled student was receiving sufficient educational benefits to satisfy the requirements of the EHA (reenacted as the IDEA in 1990, see n. 1 infra). However, unlike the instant situation, the child in *Rowley* was "receiving substantial specialized instruction and related services, and [was] performing above average in the regular classroom of a public school system." *See Rowley,* 458 U.S. at 202, 102 S.Ct. 3034. The *Rowley* Court's decision was made in a context where the student at issue was receiving excellent educational care and reaping the educational benefits contemplated by the Act; several school personnel took sign-language courses in anticipation of her arrival and an appropriate, focused and effective IEP was developed and implemented on her behalf. *See id* at 184, 102 S.Ct. 3034. The point of contention leading to the underlying litigation in *Rowley* arose when the child's parents requested and were denied an additional service. *See id.* Recognizing all too well that the majority of violations that would occur under the Act would not arise in cases where the child was being significantly benefited, the *Rowley* Court did "not attempt [·] to establish any one test

for determining the adequacy of educational benefits conferred upon children covered by the Act," and stated that they would "confine [their] analysis to that situation" presented in *Rowley. See id* at 202, 102 S.Ct. 3034. Therefore, the plaintiffs are correct in contending that the holding in *Rowley* is limited to cases where it is found that a child has not been denied FAPE. In cases where it is determined in administrative and/or judicial proceedings that child has been unlawfully denied FAPE, "the basic floor of opportunity" discussed in *Rowley, see id* at 200, 102 S.Ct. 3034, must give way to the remedial necessity at hand and the provision of FAPE that is constructed to correct the results of a school system's past violations and confer the educational benefits contemplated by proper implementation of the Act in the first instance.

The plaintiffs here are not asking that Alex be provided with a level of education or educational services designed to place him on footing commensurate with non-disabled children. Rather, we have a school system that, for more than four years, has denied Alex even the "basic floor of opportunity" discussed in *Rowley,* and a request that Alex be provided education to adequately compensate for this denial. Alex is a severely autistic child who has been·repeatedly mis-diagnosed and mishandled by DCPS. For the foreseeable future the majority of Alex's education will be remedial, in that educators, aides and his family will have to correct four years of mis-education before Alex is fully brought up to speed and operating at an educational level commensurate with his age and abilities as a disabled child. All·of this must be taken into account when constructing a truly compensatory education program for Alex. The record evidence and hearing officer's findings reveal that Alex's current placement and ed-

ucational program at Barnard Elementary School are not appropriate. The defendants offered no evidence to refute the purported and found inadequacy of the program at Barnard Elementary School, and did not appeal the hearing officer's findings. .

Given his authority under the Act and the case law, it was inexcusable for the hearing officer to decline the proposed remedy supported by the record evidence, and wholly inappropriate for the defendants to reassign Alex to the same program at Barnard Elementary School. As contemplated by the Act, in the first instance and definitely at the compensatory stage when FAPE has been denied to the significant and tragic detriment of the child, it is clear to the Court that the plan of action and educational program requested by the plaintiff and supported by all manner of evidence on the record is entirely appropriate. Although, the Act, even as interpreted in *Rowley*, does not require states to maximize a disabled child's educational potential in a manner intended to place him on equal footing with the average non-disabled child, the Act does require "appropriate" education tailored to the needs of the individual disabled child so that his autonomous potential is realized. *See id* at 181, 187–90, 102 S.Ct. 3034. In this case Alex's condition has been exacerbated by DCPS's failure to adequately address his needs as required under the Act since 2000, and therefore, a remedy fashioned under the Act must take into account the full extent of the remedial duties owed to Alex.

Based on the record evidence and the case law, the court finds that the plaintiffs have proved by a preponderance of the evidence that the educational program they requested is reasonably calculated to confer the remedial and contemporary educational benefits contemplated by the Act

and due Alex, and hereby orders the defendants to institute the program as requested by the plaintiffs immediately. While defendants are correct in their general assertions that a parent may not unilaterally dictate the educational program to be conferred upon her child, "[e]nvisioning the IEP as the centerpiece of the statute's education delivery system for disabled children, and aware that schools had all too often denied such children appropriate educations without in any way consulting the parents, Congress repeatedly emphasized throughout the Act the importance and indeed necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig*, 484 U.S. at 311, 108 S.Ct. 592. Decisive of the Court's decision is not that Alex's mother requested the ABA program, but that the ABA program is designed to meet Alex's educational needs. Here, we have a case where the record evidence and Ms. Diatta's admirable perseverance on behalf of her child support the educational program that the plaintiffs request, while the defendants have utterly failed to create a record or otherwise set forth a plan of action as required by § 1412(a)(1)-(5), the section governing the requirements of state compliance with the Act, and § 1414(d)(1)(A)(i)-(iv), (viii), the section governing the development and implementation of an IEP.

▆▆▆ The Court further finds that the period of compensatory education accrues from the time that the DCPS knew or should have known that Alex was not receiving FAPE. *See Ridgewood*, 172 F.3d at 250. Here, the school district was aware as early as 1999, when Alex's Head Start teacher referred him for evaluation, that Alex had a disability that would qualify him under the Act. DCPS was definitely on notice between December 1999 and

March 2000, when Dr. Frank evaluated Alex and issued a report diagnosing him as autistic and in need of requisite therapeutic education. Well in advance of Alex's third birthday, DCPS was aware of his disability and should have been prepared to meet his needs as of May 20, 2000, the date that Alex turned three years of age and formally qualified for FAPE under the Act. DCPS should have been prepared upon Alex's arrival with a plan of action, specifically an IEP that would have provided FAPE to Alex. Given the amount of advanced notice, DCPS's failure is inexcusable, as was the hearing officer's finding that the period for compensatory education began to accrue on November 20, 2000. Therefore, the Court finds that Alex's compensatory education period runs from May 20, 2000 to present.

## CONCLUSION

For the aforementioned reasons, the Court hereby grants the Plaintiffs' Motion for Summary Judgment [17], denies the Defendants' Motion for Summary Judgment [18], and denies as moot the Plaintiffs' Motion for Preliminary Injunction [9].

A separate order shall issue this date.

SO ORDERED.

## ORDER

For reasons stated in the accompanying memorandum opinion, the Court hereby grants the Plaintiffs' Motion for Summary Judgment [17] and Orders:

The defendants to provide compensatory education to Alex from the date of accrual, May 20, 2000, to the present.

The Court orders the defendants to pay for the one-on-one Applied Behavior Analysis ("ABA") program within 30 days of the submission of any and all invoices from the providers of ABA training, consultation and monitoring, including costs for the initial creation of an ABA program, periodic review and adjustment of that program, seminars for training therapists and Ms. Diatta, and the fees charged by the therapist for training, follow-up seminars and meetings, and direct provision to Alex of one-on-one ABA service therapy for 40 hours per week and any other reasonable costs and fees that are necessary for the provision of these services.

The plaintiffs may obtain the aforesaid services from such private or public providers as they choose.

The defendants shall, within five days of this order, advise plaintiffs' counsel in writing of the name, phone number, fax number, address and e-mail of the District of Columbia Public School contact person to whom bills shall be presented and provide to plaintiffs' counsel any forms or guidelines for submission of bills or payment that may be required under the defendants' procedures.

The Court further orders the defendants to comply with the requirements of the IDEA, specifically noting the evaluation, review and modification requirements of § 1414(d)(1)(A)(i)-(iv), (viii) of the Act to ensure that the program provided to Alex is at all times designed to meet his educational needs.

Having granted the Plaintiffs' Motion [17], the Court hereby denies the Defendants' Motion for Summary Judgment [18], and denies as moot the Plaintiffs' Motion for Preliminary Injunction [9].

SO ORDERED.