Joanne BLOMSTROM, John Dacey, William J. Dineen, Rosana Molinari, Peter Sperandio, as they Constitute the School Committee of the City of Stoughton, Massachusetts, Plaintiffs,

v.

MASSACHUSETTS DEPARTMENT OF EDUCATION and Paula B. as she is the Parent of Scott B., Defendants.

Civ. A. No. 80–2577–MA.

United States District Court, D. Massachusetts.

Feb. 12, 1982.

---

Barry Mintzer, Boston, Mass., for plaintiffs.

Richard N. Sullivan, Murphy, Lamere & Murphy, Braintree, Mass., Joan C. Stoddard, Asst. Atty. Gen., Boston, Mass., for defendants.

## OPINION

MAZZONE, District Judge.

The plaintiffs, members of the school committee in Stoughton, Massachusetts, seek judicial review of an order by the Massachusetts Bureau of Special Education Appeals (BSEA) requiring them to pay for the day portion of the private school education of Scott B. for the period November, 1979 to April, 1980. While Scott B. was the subject of a number of evaluations and, apparently, was the focal point of an extended placement controversy, the sole issue here is to decide who bears the financial responsibility for Scott B.'s private schooling. The Massachusetts Department of Education and Mrs. B., Scott's mother, seek affirmance of the state administrative order.

### I.

There is no dispute that Scott B. is entitled to some form of publicly financed special education. Provision of these services is governed by the Education for All Handicapped Children Act of 1975 (EAHCA) codified at 20 U.S.C. § 1401 et seq. and the Massachusetts special education statute found at Mass.Gen.Laws c. 71B (West Supp. 1981).

Scott B. was examined in accordance with the statutory scheme and, on June 4, 1979, the plaintiffs proposed an "individual education plan" for the 1979–1980 academic year. The plan provided a program contained in 603 C.M.R. § 502.3.[1] Mrs. B. rejected this plan on June 29, 1979 and ap-

---

1. The Massachusetts Department of Education regulations describe the available prototype programs at 603 Code of Massachusetts Regulations § 502. The prototype described in § 502.3 consists of regular classroom education with no more than 60% of the class time each day spent outside the classroom receiving special education.

pealed the committee's decision to the Department of Education. When the school year began, Mrs. B. enrolled Scott in the § 502.3 plan at the Stoughton High School but, in October, 1979, she moved Scott to the Eagle Hill school, a private residential school providing a program described in § 502.6.[2]

Lydia Sinclair, hearing officer for the BSEA, conducted hearings on November 26 and December 4, 1979 concerning Mrs. B.'s appeal as to the appropriate placement for Scott. In April, 1980 she concluded that the § 502.3 plan developed by the school committee was inadequate to meet Scott's educational needs, but, in addition, the § 502.6 placement undertaken by Mrs. B. was also inappropriate. Instead, Ms. Sinclair concluded, the appropriate placement was a § 502.4[3] program within the Stoughton High School.

Mrs. B. appealed the hearing officer's conclusion to the State Advisory Commission for Special Education (SAC). The SAC, on June 7, 1980, remanded the case to the hearing officer seeking clarification of the financial responsibility for the Eagle Hill School costs in light of the inadequacy of the originally proposed placement (§ 502.3). On remand, all parties presented affidavits to the hearing officer, Reece Erlichman, in lieu of live testimony. The hearing officer concluded that a § 502.5[4] day placement was the least restrictive appropriate placement of which Mrs. B. was aware and, therefore, the Stoughton School Committee was responsible for that component of the Eagle Hill School costs. This decision was tentatively affirmed by the SAC in January, 1981, with a final affirmance, adopting hearing officer Erlichman's decision, rendered in March, 1981.

The Stoughton School Committee appealed Erlichman's decision to this Court in November, 1980. However, all parties consented to a stay pending final SAC rulings.

The parties have now stipulated to the record before this Court and seek review of the final Decision on Remand rendered by hearing officer Erlichman and affirmed by the SAC.

## II.

This dispute is governed by federal law. *Town of Burlington v. Department of Ed. of Comm. of Mass.*, 655 F.2d 428, 431 (1st Cir. 1981) ("[T]his federal specification for review, when invoked, seems to us designed to occupy the field over an inconsistent state provision."). However, the substantive content of the federal law must be determined according to the principles in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957):

Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. Federal interpretation of federal law will govern not state law. But state law, if compatible with the purposes of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.

*Id.* at 457, 77 S.Ct. at 918 (citations omitted). The objective here is to implement a rule, from whatever source, that advances the federal policy behind the EAHCA. The defendants urge that a rule permitting reimbursement of Mrs. B. would further the statutory goals, while the plaintiffs suggest that such a rule would thwart them.

The general goal of the Act is

2. A § 502.6 prototype is a residential school program outside of the public school system.

3. The § 502.4 prototype plan is a substantially separate program designed for and made up entirely of children with special needs.

4. The prototype described in § 502.6 consists of a private school placement for at least 5 hours per day with the child continuing to live at home.

to assure that all handicapped children have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their needs, to assure that the rights of the handicapped children and their parents or guardians are protected, to assist states and localities to provide education to all handicapped children and to assess and assure the effectiveness of efforts to educate handicapped children.

*Cox v. Brown*, 498 F.Supp. 823, 828 (D.D.C. 1980) *quoting* Education of All Handicapped Children Act of 1975, Pub.L.No. 91–230, § 601 *as amended* by Pub.L.No. 94–142, § 3(a) *reprinted at* 20 U.S.C. § 1401 (1976) (Historical Note).

To implement the Act's goal Congress guaranteed each parent the right to an impartial due process hearing by a state or local educational agency if the parent wishes to challenge the child's placement. 20 U.S.C. § 1415(b)(2). If the parent disagrees with the decision of the local agency an appeal is provided to the state agency. 20 U.S.C. § 1415(c). Finally, the parties may appeal an adverse decision by the state agency to the state courts or the United States District Court. 20 U.S.C. § 1415(e)(2). The District Court must review the proceedings and render a decision based upon a preponderance of the evidence. *Id.*

In conjunction with the hearing requirements and the appellate rights, the Act also contains a "stay put" or "status quo" provision that provides that

[d]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parent or guardians otherwise agree, the child shall remain in the then current educational placement of such child ... until all such proceedings have been completed.

20 U.S.C. § 1415(e)(3). The plaintiffs argue that this provision forbids reimbursement in this case.

There is almost no legislative history relating specifically to § 1415(e)(3). There is only one reference in the congressional reports:

The provisions of the existing law with respect to the binding effect of due process hearings and appropriate administrative and judicial review of such hearings are clarified and language is also adopted to require that during the pendency of any administrative or judicial proceedings regarding a complaint, unless the State or local educational agency and parents or guardian otherwise agree, the child involved in the complaint shall remain in his or her present educational placement, or, if the complaint involves an application for initial admission to public school the child shall, with the consent of the parents or guardian be placed in the public school program until the completion of all such proceeding.

Joint Explanatory Statement of the Conference Committee, S.Conf.R.No. 94–455; H.Cong.R.No. 94–664, 94th Cong., 1st Sess. *reprinted at* U.S.Code Cong. & Admin.News 1425, 1503 (1975). *See also Stemple v. Bd. of Ed. of Prince Georges Cty.*, 623 F.2d 893, 897 (4th Cir. 1980), *cert. denied*, 101 S.Ct. 1348, 450 U.S. 911, 67 L.Ed.2d 334 (1981).

■ As a starting point, there is nothing in the legislative history that mentions, and therefore prohibits, reimbursement. Consequently, the general intent of the Act must govern. The procedural protections found in § 1415 were adopted in 1975 "to establish in law a comprehensive mechanism which will insure that those provisions enacted by the 93rd Congress will result in maximum benefits to handicapped children and their families." S.Rep.No. 94–168, 94th Cong., 1st Sess. *reprinted in* U.S.Code Cong. & Admin.News at 1425, 1430 (1975). The entire Act is for the benefit of handicapped children and their families. Any rule adopted here must seek to maximize those benefits within the framework established by Congress.

It is clear that the overriding congressional concern was meeting the needs of handicapped children. The elaborate system of procedural safeguards contained in section 615 was thought to be the best

method of assuring appropriate program decisions.

*Anderson v. Thompson*, 658 F.2d 1205, 1209, 1212 (7th Cir. 1981).

The courts have had some difficulty in developing a consistent set of rules that best effectuate the congressional goal of protecting the children and their families. The Fourth Circuit Court of Appeals has adopted a reading of § 1415(e)(3) that not only denies the parents reimbursement but also removes the parents' right to change the child's placement at all.

> Taken literally, the language of § 615(e)(3) creates a duty on the part of the parents who avail themselves of the hearing and review provisions of § 615 to keep their children in the then current educational assignment while the hearing and review provisions are pending, absent agreement between them and the education authorities that some different arrangement be made. Of course, that duty may not be totally enforceable by the State, but it certainly negates any right on the part of the parents, in violation of the duty and in the absence of agreements, to elect unilaterally to place their child in private school and recover the tuition costs thus incurred.

*Stemple v. Bd. of Ed. of Prince Georges Cty.*, 623 F.2d at 897. *See also Monahan v. Nebraska*, 645 F.2d 592 (8th Cir. 1981).

Despite the view expressed in the Fourth Circuit, other courts have refused to find that Congress intended to have parents lose the right to move their children simply by invoking the procedures adopted in the Act for their protection.[5] The Ninth Circuit Court of Appeals specifically rejected the "literal" approach of the Fourth Circuit.

Moreover, because we are certain that parents have *the right* to move their

handicapped children to private schools, we view § 615(e)(3) as expressing a congressional preference rather than creating a statutory duty.

*Anderson v. Thompson*, 658 F.2d at 1209. (emphasis added). That Court went on to conclude that the language of § 1415(e)(2) permitting the district court to "grant such relief as the court determines is appropriate" allows "damages" equal to the tuition costs in two circumstances.

> [First], when a court subsequently determines that the services in dispute were necessary to protect the physical health of the child and also where services should have been provided by the school district the district court has the statutory authority to recompense parents for the costs of these services the school district failed to provide.

> A second exceptional circumstances would exist when the defendant has acted in bad faith in failing to comply with the procedural provisions of section 615 in an egregious fashion.

*Id.* at 1209. These exceptions are based on the premise that § 1415(e)(3) is not a complete bar to reimbursement.

Other federal courts have adopted positions similar to that taken by the Ninth Circuit. *See Foster v. District of Columbia Bd. of Ed.*, 523 F.Supp. 1142, 1150 (D.D.C. 1981) ("[T]he provisions above need not be construed as an absolute bar to all retroactive tuition payment. Self-help may be sanctioned, indeed requisite, in some exceptional cases with unique factual occurrences, where the parent has exhausted all other avenues for relief or other considerations of justice compel it.") *Id. citing Parker v. District of Columbia Bd. of Ed.*, EHLR 551:267 (D.D.C.1979); *Tatro v. Texas*, 516

---

5. Some courts have read the provisions of § 1415(e)(3) to act as an "automatic preliminary injunction" that precludes even a court from permitting the child to change placements. *See Monahan v. State of Nebraska*, 491 F.Supp. 1074, 1088, *vacated in part*, 645 F.2d 592 (8th Cir. 1981) ("The court is therefore without power to place a child in any provisional placement except for his then current educational placement." *Id.*); *Zvi D. v. Am-*

bach, 520 F.Supp. 196, 201 (E.D.N.Y.1981). This view is not unanimous however. *See Cox v. Brown*, 498 F.Supp. at 827 ("The defendant's representation that § 1415(e)(3) precludes judicial action in providing the Cox children with appropriate education that they deserve at this time simply cannot be accepted." *Id.*). Until the statute is clarified by Congress or construed definitively by the Supreme Court conflicts in interpretation will continue.

F.Supp. 968 (N.D.Tex.1981); *see also Campbell v. Talladega Cty. Bd. of Ed.*, 518 F.Supp. 47, 56 (N.D.Ala.1981); *Sherry v. New York State Educ. Dept.*, 479 F.Supp. 1328 (W.D.N.Y.1979). Thus, contrary to the plaintiffs' position, the *Stemple* opinion is not the sole statement of federal law. Although the facts of the cases above did not generally allow the courts to order reimbursement, the principle seems fairly established that, at least under some circumstances, retroactive tuition payments are appropriate and not barred by § 1415(e)(3).

Massachusetts law also permits reimbursement. The Department of Education allows the parents to be paid when the school committee fails to designate an appropriate program for the child. Here, the Stoughton School Committee did not meet its responsibility of providing Scott B. with an appropriate free placement. The statutory policy is advanced by having them compensate Mrs. B. for that failure.

> If the statutory system had worked as intended the child would have received publicly financed educational services after his parents had accepted the originally provided plan. We think that the [reimbursement] policy adopted by the Department exactly preserves this legislative goal.

*Amherst-Pelham Regional School Comm. v. Dept. of Ed.*, 376 Mass. 480, 492, 381 N.E.2d 922 (1978).

Since the EAHCA was a compromise that carefully considered budgetary constraints facing local communities and the problems inherent in evaluating children with special needs, *see Anderson v. Thompson*, 658 F.2d at 1212–1213, the best rule is one that forces each party to bear the costs of their own errors while simultaneously keeping in mind the best interests of the child. The result crafted by the BSEA does precisely that. The school committee must compensate Mrs. B. only for the least restrictive appropriate alternative of which she was aware. Consequently, Mrs. B. must bear part of the additional cost of placing Scott in the unnecessarily restrictive environment of Eagle Hill School. Each side bears its

share of the costs and the child is given some continuity to his educational experience. The Massachusetts Supreme Judicial Court endorsed this compromise when it upheld the policy of reimbursement adopted by the Department of Education:

> In this case, the parents chose to reject the proposed plan, in a belief that appropriate services could be provided only in a private residential setting such as the one offered at Eagle Hill School. Rather than (1) limiting their child to a 'regular education program' which from the beginning was known to be inappropriate or (2) placing the child in a program for which the school committee was willing to pay, the parents continued the child's placement at Eagle Hill School. In so doing, they assumed a financial risk that the bureau would recommend a different placement. The bureau's decision after hearing, however, found the parents course of action to be correct. In these circumstances the departmental policy requiring reimbursement places the parent and child precisely where they would have been had the school committee initially fulfilled the statutory obligations in educating the child.

*Amherst-Pelham Regional School Committee v. Dept. of Ed.*, 367 Mass. at 497. Although the *Amherst-Pelham* case did not raise the issue in the same precise posture as this case, it does clearly establish the principle of reimbursement under Massachusetts law.

Even if no other court had recognized the principle of reimbursement, the policy of the Act strongly suggests such a rule is appropriate. When the Act is considered in light of the practical application of the due process provisions the logical construction of § 1415(e)(2) and § 1415(e)(3) permits reimbursement. Given the inevitably protracted nature of any due process proceedings, the best interests of the child and his family would not be served by forbidding the parents to move the child. Many parents would likely be willing to alter the child's placement for his own benefit if they stood a reasonable chance of ultimately be-

ing reimbursed. That number would be reduced if the possibility of reimbursement were foreclosed. Thus, without the right to reimbursement if the school committee makes an error, many children will unnecessarily be denied the right to free appropriate education that the Act seeks to provide.

The right to reimbursement would also create the appropriate incentives for the local school committee. Without impugning the conduct of these plaintiffs in any way, it is natural that local officials facing the prospect of expensive special education programs during a period of fiscal crisis may, even unconsciously, be less than zealous in guaranteeing the child's right to a free and appropriate education. If they are forced to pay eventually, then every incentive points toward making the initial placement the correct placement.

Congress did not intend to create a system that would cause a child to stay mired in an inappropriate program while the appellate mechanism slowly determined his fate. *See Tokarcik v. Forest Hills School District,* 665 F.2d 443 at 465 (3rd Cir. 1981) (Rosenn, C.J. dissenting). Permitting reimbursement is a sound compromise. If the school committee was initially wrong everyone would be restored to the position the statute initially sought to encourage. If the parent was incorrect they must bear the financial burden of giving their child a private education as any other parent would. In both cases, however, the child receives the education considered appropriate by his parents, the party normally vested with the power to make such decisions. Barring reimbursement or forbidding transfer would compromise this parental right; a right sought to be encouraged by the Act. In addition, without compensation, if an error was made by the local school committee the child would be forced to endure it for the entire appellate process regardless of the harm. The statute was not designed to encourage this sort of situation.

The fact that the plaintiffs must reimburse Mrs. B. for the day portion of the Eagle Hill costs does not mean that the plaintiffs had the obligation of placing Scott in a § 502.5 setting. Rather, the school committee simply has the obligation of compensating the parents for the costs incurred by their failure to appropriately designate a program for Scott initially. Typically that would involve paying the parent for the program they unilaterally adopted when it is subsequently found to be the correct placement. *See Fitzgerald v. Anrig,* C.A. No. 81–1849 (D.Mass. December 21, 1981).[6] However, in this case the plan chosen by the parent was also not appropriate. The school committee is not required to pay for that error. It is undisputed that the most appropriate program of which Mrs. B. was aware was a § 502.5 plan. Mrs. B. should have placed Scott in such a program. Had she done so there would be little question that she is entitled to be reimbursed based on the principles given above. The school committee could have limited its damages in this case simply by making Mrs. B. aware of the alternative options for Scott's placement. Had they done so, they would only be required to compensate her for a § 502.4 program.

Again, placing the burden of informing the parent on the school committee creates the appropriate incentives. When a parent is dissatisfied with the placement decision the committee will inform the parent of the other available programs. Exactly which program the parents adopt would remain their decision and would be accompanied by the financial risk of error. This does not require the school committee to be prescient or to offer the child a program that its evaluations do not suggest is appropriate. It simply means that the school committee can limit its exposure to the parents by informing them of the alternative placements.

Within the confines of the statutory scheme the goal always remains the best

---

**6.** In *Fitzgerald v. Anrig* the Court found that the BSEA decision and the parents' acceptance of it indicated that the parties "otherwise agreed" within the meaning of the statute. Since I conclude that reimbursement is appro- priate in this case even absent an agreement, it is not necessary to determine whether the facts here are sufficient to constitute an agreement thereby taking the case outside the provisions of § 1415(e)(3).

interests of the child. Here, that interest is best served by making the parents completely aware of the educational options for their children. It is undisputed that Mrs. B. was unaware of the § 502.4 option, although she did know of the § 502.5 placement. Consequently, the decision of the state agencies that reimbursement should be given for the § 502.5 plan is correct. The decision is entirely consistent with the goal of the Act.

Having established that Mrs. B. has a legal right to reimbursement when the school committee makes an incorrect initial placement, the only remaining question is whether the facts in the record adequately support the hearing officers' decision. The affidavits and documents submitted by the parties prove by a preponderance of the evidence that Mrs. B. should be reimbursed for the day portion of Scott's private education.

There is no real debate that the original § 502.3 placement was inappropriate. Scott's difficulties in the § 502.3 program are well documented and included a deteriorating emotional state, high absenteeism and anxiety. Both Dr. Dorman and Dr. Sanders noted the problems associated with mainstreaming Scott in the manner required by the § 502.3 program. However, the evidence also indicates that Scott would benefit from some contact with the regular school environment and, thus, the Eagle Hill School placement was unduly restrictive. The hearing officer's conclusion that the § 502.4 program with mainstreaming based on Scott's progress was appropriate is supported by a preponderance of the evidence.

After considering the affidavits submitted by the parties and the various opinions and orders by the BSEA and SAC a preponderance of the evidence also supports the conclusion that Mrs. B. should only be reimbursed for the day portion of the Eagle Hill placement. Mrs. B. stated in her affidavit that "[a]t the Core meeting no alternative plans of any kind were discussed or mentioned or presented. I was then and remain now without knowledge as to whether Stoughton had or has a prototype

502.4 of any kind." Affidavit of Mrs. B., September 19, 1980. Not only is there no evidence to contradict this assertion, but the affidavit of MaryLou McCrillis, Assistant to the Administrator of Special Education for the Stoughton Schools, confirms that Mrs. B. was not informed of the § 502.4 option, although placing the blame on Mrs. B.: "I would assert that the reason that no discussion of alternative programs for Scott took place was because of [Mrs. B.'s] abrupt rejection of the plan in question along with her expressed intention to reject any plan proposed." Affidavit of MaryLou McCrillis.

While this case has not been a model of cooperation among the individuals, all of whom are interested only in the best interests of Scott B., the fact remains that Mrs. B. was not aware of the § 502.4 option. Given this lack of knowledge and the advice of Dr. Sanders that a residential placement was appropriate the placement of Scott B. in a program more restrictive than the § 502.3 plan offered would have been natural.

Accordingly, after a review of the record, the Decision on Remand of the SAC hearing officer Reece Erlichman is based upon a preponderance of the evidence and that decision is adopted and affirmed. Judgment is to be entered for the defendants.

SO ORDERED.