**John DOE, et al., Plaintiffs, Appellees,**

v.

**BROOKLINE SCHOOL COMMITTEE, Defendant, Appellant.**

**Nos. 83–1131, 83–1514.**

United States Court of Appeals, First Circuit.

Argued Aug. 2, 1983.

Decided Dec. 6, 1983.

Cathleen Cavell, Brookline, Mass., with whom David Lee Turner, Brookline, Mass., and Robert P. Snell, Rochester, N.Y., were on brief, for appellant.

H. Reed Witherby, Asst. Atty. Gen., Government Bureau, Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., was on brief, for the Mass. Dept. of Education, Boston, Mass.

Anne Vohl, Burlington, Mass., for John Doe, et al.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ–GIMENEZ,* District Judge.

BOWNES, Circuit Judge.

This case arises under the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401 et seq., and presents three issues. First, who bears responsibility for funding the nonpublic educational placement of a disabled child during the pendency of placement review proceedings? Second, does § 1415(e)(3) preempt a district court's equity powers and require absolute enforcement of a current placement pending review? Third, is reimbursement for tuition costs expended available to a prevailing party under §§ 1415(e)(2) and (e)(3) of the Act? Before reaching these issues, we must explain why the case before us now is not moot.

### I.

The Education for All Handicapped Children Act provides federal funds to assist state and local agencies in their efforts to educate handicapped or disabled children and conditions these funds upon a State's compliance with the Act's stated goals and procedures. In order to qualify for federal monies under the Act, a State must demonstrate that it "has in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1).

The means by which this statutory mandate is "tailored to the unique needs of the handicapped child," *Board of Education of Hendrick Hudson v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), is the "individualized education program" (IEP). 20 U.S.C. §§ 1401(19), 1414(a)(5). The IEP is formulated at a meeting of the child's parents or guardian, the teachers, the qualified representative of the local educational agency, and, where appropriate, the child. The document which emerges must specify, *inter alia,* instructional goals and objectives, any special services to be provided to the child, and criteria for progress evaluation. *See* § 1401(19). The Act further requires at least an annual review of each child's IEP and authorizes revisions where appropriate. § 1414(a)(5). *See also* § 1413(a)(11).

Plaintiff child has severe specific learning disabilities, a handicap encompassed by the Act. He and his parents live in the Brookline, Massachusetts school district. In September 1979 the parents rejected the IEP proposed by the Brookline School Committee and enrolled the child in the Carroll School, a private school which specializes in the education of children with learning disabilities. In conformance with the administrative remedies created by the Act, § 1415, the parents appealed the proposed IEP to the Bureau of Special Education Appeals (BSEA) of the Massachusetts Department of Education. On February 8, 1980, BSEA ruled that the plan proposed by Brookline was "inadequate and inappropriate" and "that the Carroll School is the least restrictive, adequate and appropriate educational setting." The BSEA also ruled that Brookline was responsible for the financial costs of the child's education at the Carroll School starting in September of 1979.

The child completed the 1979–80 school year at Carroll. On June 3, 1980, Brookline

---

* Of the District of Puerto Rico, sitting by designation.

reviewed the situation and determined that the child should, pursuant to the IEP, continue his education at the Carroll School for the 1980–81 school year. Almost one year later, on May 12, 1981, another review was held by Brookline. This resulted in an IEP calling for the immediate placement of the child in a public school special education program, a proposal which was rejected by the parents. The child started the 1981–82 school year at Carroll and Brookline continued to pay the costs.

In November 1981 Brookline requested a review by the BSEA of the IEP that recommended public school placement. After hearings in February, the BSEA ruled on April 21, 1982, that the child should be placed in the public school program as called for in the latest IEP. On May 27, 1982, the parents brought a complaint in the district court pursuant to 20 U.S.C. § 1415(e)(2). The pertinent parts of the complaint ask that the court decide the appropriate IEP for "the present and prospectively" and that Brookline be ordered to pay for the child's education at the Carroll School pending final decision of the case.

Brookline paid the tuition at the Carroll School for the year 1981–82, but refused to pay for the 1982–83 year. According to an affidavit filed by the father, he was not notified until after his son's matriculation at the Carroll School for the 1982 fall term that Brookline would not continue to pay the tuition.

Plaintiffs filed a motion on September 29, 1982, asking that Brookline be ordered to continue paying for the child's education at the Carroll School until the merits of the IEP had been finally decided. The motion was styled, "Motion For Temporary Relief, *Pendente Lite*"; it was not a motion for a preliminary injunction. Plaintiffs argued that 20 U.S.C. § 1415(e)(3) mandated such an order and that a preliminary injunction was not required.[1] The district court treated the motion as one for summary judgment and, after a hearing, ordered "that

defendant Brookline School Committee fund the cost of plaintiff's education at the Carroll School for the entire 1982–1983 school year according to the terms of the 1980–81 IEP and thereafter, until completion of all review proceedings specified in 20 U.S.C. § 1415."

The order directing Brookline to fund the child's private education issued on January 20, 1983. On January 26 the parents removed the child from the Carroll School and placed him in another private school at their own expense. The case was officially closed in the office of the district court clerk. Brookline filed a notice of appeal on February 17, 1983. After learning that the case was shown as closed in the district court records, Brookline moved to reopen on March 30, 1983. Plaintiffs opposed the motion to reopen stating, *inter alia,* that because Brookline had not paid the tuition to the Carroll School as ordered on January 20, the parents could not assume the risk of payment and the child, therefore, had been placed at their own expense in a less expensive private school. Plaintiffs also moved on April 4, 1983, that the court enforce its January 20 order and require Brookline to pay the Carroll School the child's past due tuition for the period from September 1, 1982 through January 1983.

On May 23, 1983, the court denied Brookline's motion to reopen and granted plaintiffs' motion for enforcement of its January 20 order stating, "The Court's order entered 1/20/83 was not stayed pending appeal." Brookline then moved on May 27, pursuant to Federal Rule of Civil Procedure 60(b)(6), for relief from the court's denial of its motion to reopen. This motion raised explicitly for the first time the question whether the parents or Brookline should bear the financial responsibility for the child's 1982 fall tuition at the Carroll School. On June 1, 1983, Brookline paid the tuition due the Carroll School ($3,837.35) and on June 21 filed a notice of appeal from the denial of the Rule 60(b)(6) motion.

---

1. Plaintiffs also stated that they could prove the grounds for a preliminary injunction, if necessary.

That appeal was stayed upon motion of all parties pending our decision in this case.

## II.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969); *United States v. Parole Commission v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). "The usual rule in federal cases is that an actual controversy must exist at all stages of appellate or certiorari review, and not simply at the date the action is initiated." *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973) (citations omitted).

We must look through the labels used in this case and its muddled procedural history to determine what is before us. The complaint raised two issues: the appropriateness of the IEP, and interim relief pending that determination. The court's order granted the interim relief sought. Brookline took a timely appeal from the order. It seems apparent that the case was mistakenly closed in the district court clerk's office, a mistake which should have been corrected. This would have made unnecessary both the motion to reopen and the separate appeal from the court's refusal to do so.

Brookline's payment in June of the past due tuition did not moot the issue of who ultimately would be liable for the tuition; all Brookline did was obey an order of the court. Its motion to reopen raised precisely the question of tuition reimbursement. The plaintiff parents were aware that they might be held liable for the tuition at the Carroll School for the 1982–83 year. Indeed, this was given as the reason for placing the child in a less expensive private school.

Cutting through the procedural snarl, it is clear that we are faced with an appeal from an order of the district court, the resolution of which will result in one of the parties being out-of-pocket in the amount of the fall tuition—$3,837.53. There is, therefore, an actual controversy at the appellate stage of the case.

A recent case from the Fifth Circuit dealt with a mootness claim in a similar situation. In *Stacey G. v. Pasadena Independent School District,* 695 F.2d 949 (5th Cir.1983), the district court granted a preliminary injunction ordering a school district to pay, pending final resolution of the case, the costs of education at a private school in which the parents had placed their child. The school district appealed, but before the appeal was heard a permanent injunction issued giving plaintiff substantially the relief sought. In holding that the case was not moot, the court stated, "the final judgment did not in terms resolve the issue raised by this appeal, that is, whether preliminary injunctive relief was appropriate to require Pasadena to pay the entire interim costs of Stacey's private schooling prior to the final judgment." *Id.* at 955. We realize that in *Pasadena* the parents had posted a bond to cover any payment they might owe. In the instant case, Brookline never had a chance to ask for a payment bond because the plaintiffs, with the court's acquiescence, chose not to seek interim relief via the traditional preliminary injunction approach. Although the district court here used the summary judgment format, its order was just as binding as the preliminary injunction in *Pasadena.* And, as in *Pasadena,* the issue on appeal has not been resolved.

In *Doe v. Anrig,* 692 F.2d 800 (1st Cir. 1982), we, *sua sponte,* raised the question of mootness noting that the case involved educational placement for a period in the past. We felt, however, that "because there continues to be a controversy over current placement, *as well as over reimbursement for costs in past years,*" there was no mootness problem. *Id.* at 804 (emphasis added). Here, the controversy over prospective placement has become moot [2], but the issue of reimbursement is very much alive.

We rule that the appeal from the order requiring Brookline to pay the tuition at the Carroll School for the 1982–83 school

**2.** The parents state they will not return the child to the Brookline school system.

year is not moot. The issue presented by the district court's denial of Brookline's motion to reopen is whether a reimbursement remedy is available to Brookline. This issue, although technically separate from the issues raised in No. 83–1131, the use of summary judgment procedure and the order to Brookline to pay the child's interim tuition at the private school, is inextricably intertwined with them and has been adequately briefed by the parties. We, therefore, consolidate the appeal in No. 83–1514 with No. 83–1131, and proceed to the merits.

### III.

### A.

We now turn to the question of who bears responsibility for funding the private educational placement of a disabled child during the pendency of review. We first focus on two subsections of the Act that, *inter alia,* are denominated "procedural safeguards." Section 1415(e)(2) authorizes a private right of action to "any party aggrieved by the findings and decision" of the final administrative review conducted by the state educational agency. The provision further directs that courts having jurisdiction of these actions "shall grant such relief as the court determines is appropriate." *Id.*

The following provision, § 1415(e)(3), is designed to guarantee a coherent educational experience for the disabled child until the conclusion of the review of the contested IEP. It states that

> [d]uring the pendency of any proceedings . . . unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.

*Id.* As we observed in *Doe v. Anrig,* 692 F.2d 800, 810 (1st Cir.1982),

> Section 1415(e)(3) is designed to preserve the status quo pending resolution of administrative and judicial proceedings

under the Act. *See Monahan v. State of Nebraska,* 491 F.Supp. 1074, 1088 (D.Neb. 1980), *aff'd in relevant part,* 645 F.2d 592, 597–598 (8th Cir.1981).

By its enactment of (e)(3) Congress indicated that despite an ongoing IEP conflict, consistency in a disabled child's education is highly important. The benefits of such a policy are obvious and we need not belabor them here. What is not addressed in this statutory subsection, however, or in any other section of the Act is this directive's corollary: how financial responsibility for tuition and any covered services is to be allotted to the parties where the current educational placement is a private school.

When a school system cannot provide an appropriate education for a disabled student within the public schools, a private placement is an expressly authorized alternative. 20 U.S.C. § 1413(a)(4); 34 C.F.R. §§ 300.400–300.452. Costs of the private program, such as tuition and necessary services, are then shouldered by the local school system with financial assistance from the state and federal governments.

In order to effectuate the (e)(3) directive, a student's private "current placement" must be funded by someone. But as we have already noted, our first guidepost in determining where this responsibility lies—the statutory language—fails to address the question of interim placement funding. Probing beyond the statute's language to its legislative history, we find a dearth of explicative attention given to the (e)(3) provision. *Accord, Stemple v. Board of Education of Prince George's County,* 623 F.2d 893, 897 (4th Cir.1980). Our interpretive bearings, then, must be gained from evaluating the goals and purposes of the Act, an inquiry which has the exclusive goal of effectuating congressional intent. *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). In conducting that inquiry, we must look to the language of the statute as a whole and interpret its various provisions harmoniously in order to achieve the congressional aims underlying the Act. *Id.*

The fundamental objective of the Act is to assure each disabled child a "free appropriate public education." 20 U.S.C. § 1412(1); 121 Cong.Rec. 37415 (Nov. 19, 1975) (remarks of Sen. Williams, principal author of Act). In providing for this, Congress specified that disabled or handicapped children be educated with nondisabled children "to the maximum extent appropriate." § 1412(5)(B). Removal of a child from the regular education environment is permitted "only when . . . education in regular classes . . . cannot be achieved satisfactorily." *Id.*[3] Thus, "the Act embodies a statutory preference for 'mainstreaming,' or the maximum possible integration of handicapped children with nonhandicapped children." *Concerned Parents v. New York Board of Education,* 629 F.2d 751, 754 (2d Cir.1980). *See also Note, Enforcing the Right to an Appropriate Education,* 92 Harv.L.Rev. 1103, 1119–1122 (1979).

Obviously, the mainstreaming policy is frustrated if parents are able to defeat any effort to transfer their child into an adequate and appropriate public school placement merely by appealing an adverse administrative decision. The construction we announced in *Doe v. Anrig,* 692 F.2d 800, however, upon which the district court heavily relied, promotes such an outcome. In *Anrig* we required that "whoever was paying for the placement prior to review shall continue to do so while review is pending." *Id.* at 800. This is also the Fifth Circuit's interpretation of § 1415(e)(3). *See Stacey G. v. Pasadena Independent School District,* 695 F.2d at 953. Additionally, *Anrig* held that reimbursement of tuition is not available at final judgment. *Id.* at 812.

Where the child's current placement is a private school, the practical effect of the *Anrig* rule is to provide an incentive for frivolous IEP appeals to the courts. Merely by filing an appeal parents can obtain the exact relief requested—maintenance of a publicly-funded private placement—and be insulated from reimbursement claims even though the public IEP is later ruled to be valid. We cannot believe Congress intended such an outcome, especially since it subverts the substantive core of the Act—the cooperative IEP process—and results in a private appropriation of public monies.

Similarly, where the parties' posture is reversed, the *Anrig* rule again undermines the statutory objectives. These cases typically involve a school committee which either refuses to complete the diagnostic and placement process authorized by the Act, *see, e.g., Quackenbush v. Johnson City School District,* 716 F.2d 141 (2d Cir.1983), and *Blazejewski v. Board of Education of Allegany,* 560 F.Supp. 701 (W.D.N.Y.1983), or which declines to provide an appropriate private placement where a public placement is plainly lacking, *see, e.g., Parks v. Pavkovic,* 536 F.Supp. 296 (N.D.Ill.1982). A school system's dilatory action, or in some cases, nonaction, denies an affected child the educational rights granted by the Act, yet under the *Anrig* rule such systems are rewarded for their misfeasance or nonfeasance. Should a parent fund a private education pending review, no reimbursement is allowed even where a court later holds the private school to be the appropriate placement under the Act; the school system has effectively transferred part of its contractual public obligation[4] to a private party, in contravention of the statute's express primary directive. *See* 20 U.S.C. § 1412(1) ("*free* appropriate public education") (emphasis added). Again, the IEP process and its procedural guarantees are subverted by the *Anrig* rule. We are therefore convinced that the *Anrig* interpretation was error.

**B.**

■ In *Town of Burlington v. Department of Education of Massachusetts,* 655

---

**3.** The Department of Education has promulgated regulations effectuating 20 U.S.C. § 1412(5)(B) at 34 C.F.R. §§ 300.550–300.556 ("least restrictive environment").

**4.** The Act is not universally applicable to all states but only to those that contract with the federal government for financial assistance in their educational programs for the disabled. *See Board of Education v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). As of 1982, all states except New Mexico have contracted for inclusion under the Act. *Id.*

F.2d 428, 433–34 (1st Cir.1981), we held that a motion for preliminary injunction is the proper procedure for determining which party will bear interim costs for maintaining a private placement. Further, we held that such a motion should be decided on the basis of "traditional criteria" and specifically required a showing of both irreparable harm and a likelihood of success on the merits. *Id.* We now reaffirm that holding.

In the case before us, however, Brookline did not move for a preliminary injunction to release it from the preexisting funding arrangements deriving from the 1981–82 IEP. Instead, Brookline unilaterally terminated funding of the plaintiff child's education at the Carroll School and notified the plaintiffs of their decision to withdraw funding subsequent to the beginning of the 1982–83 school year. The plaintiffs were then burdened with the responsibility of seeking an order to enforce the status quo.

█ We believe that because Congress has expressed a strong preference for the preservation of the status quo through its enactment of (e)(3), *see infra* at 918, and *Anderson v. Thompson,* 658 F.2d 1205, 1209 (7th Cir.1981), the motion for preliminary injunction should be made by the party wishing to depart from the status quo, here the school committee. This allocation of responsibilities will best effectuate the congressional intention behind (e)(3) and also will maintain the court's broad equity powers to do substantial justice. *Cf. Grymes v. Madden,* 672 F.2d 321, 322–23 (3d Cir.1982) (school district's unilateral termination of interim placement funding violated § 1415(e)(3)).

### IV.

Defendant Massachusetts Department of Education ("State") assigns as error the district court's holding that the plaintiff child is "both obliged and entitled to remain at the Carroll School" during the pendency of review proceedings. *See Doe v. Brookline School Committee,* No. 82–1428–G, Memorandum & Order for Summary Judg-

ment at 3 (Jan. 20, 1983). The State argues that § 1415(e)(3) does not freeze an inappropriate placement for the pendency of review and thereby bar a court from exercise of its traditional powers of equity to fashion a decree which considers all pertinent circumstances.[5] The source of this confusion, the State argues, rests in large part with our decision in *Doe v. Anrig,* 692 F.2d 800, that (e)(3) "amounts to an automatic stay preventing *any* change in a child's location and education program, *except by agreement of the parties*". *Id.* at 810 (emphasis added). The State maintains that this decision is inconsistent with our decision in *Burlington,* 655 F.2d at 434, where we affirmed the availability of "interim judicial powers of equity."

█ To the degree that *Anrig* can be read as construing (e)(3) to preempt judicial powers of equity and to establish in their stead an absolute freeze on interim placement, program and services, we overrule it. Section 1415(e)(2) is an express grant of authority to district courts to fashion all appropriate equitable relief. The power ultimately to award such relief ordinarily includes the power to issue preliminary relief in the appropriate exercise of discretion. Moreover, in the absence of a plain congressional intention to withdraw them, traditional powers of equity remain in the district court to enforce the Act. As the Supreme Court admonished in *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1981), and *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946):

> [T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. "The great principles of equity, securing complete justice, should not be

---

**5.** Not all controversies over a change in placement arise from parents' desires to have their child in a private school. *See, e.g., Monahan v. Nebraska,* 645 F.2d 592 (8th Cir.1981) (school

system sought to change deaf student's placement from public high school to state school for the deaf).

yielded to light inferences, or doubtful construction." *Brown v. Swann,* 10 Pet. 497, 503 [9 L.Ed. 508] . . . .

Especially in view of the expressly granted equity powers in (e)(2),[6] we cannot find in (e)(3) a "necessary and inescapable inference" that the court's traditional equity jurisdiction is to be denied.

■ We therefore join the Seventh Circuit in its view that (e)(3) establishes a strong preference, but not a statutory duty, for maintenance of the status quo. *See Alexander v. Thompson,* 658 F.2d at 1209. *See also Walker v. Cronin,* 107 Ill.App.3d 1053, 63 Ill.Dec. 651, 655–56, 438 N.E.2d 582, 586–87 (1982) (as a matter of statutory interpretation, citing 2A Sutherland, *Statutes and Statutory Construction* § 57.08, at 423 (4th ed. Sands 1974), the language of § 1415(e)(3) is directory rather than mandatory).[7] We do not believe Congress intended to freeze an arguably inappropriate placement and program for the three to five years of review proceedings. To construe (e)(3) in this manner would thwart the express central goal of the Act: provision of a free *appropriate* education to disabled children. § 1412(1) (emphasis added).[8]

■ The only legislative history directed to this question corroborates our view. Senator Stafford, the ranking minority member of the Subcommittee on the Handicapped, a Conference Committee member, and a major sponsor of the Act, explained to the Senate the pertinent due process provision of the bill which emerged from the Conference Committee and was eventually enacted without amendment:

We did feel, however, that the placement or change of placement should not be unnecessarily delayed while long and tedious administrative appeals were being

exhausted. Thus, the conference adopted a *flexible approach* to try to meet the needs of both the child and the State. 121 Cong.Rec. 37412 (Nov. 19, 1975) (emphasis added). A construction that mandated inflexibility would be contrary both to the interpretation by a major sponsor of the Act, which is entitled to deference, and the balance of the Act; it would also be irrational in view of the varying needs of disabled children over an extended period of time. Because this latter perspective grounds the requirement for an annual IEP review, a core substantive feature of the Act, *see* § 1414(a)(5), we cannot conclude that Congress intended to restrict courts from modifying interim placement and program where the burden for preliminary relief is satisfied.

This view of the interplay between, on the one hand, the express (e)(2) and traditional, inherent judicial powers of equity and, on the other hand, the (e)(3) provision favoring the status quo, has been supported by other courts. In *Stacey G. v. Pasadena Independent School District,* 695 F.2d at 955, n. 5, the Fifth Circuit held that

§ 1415(e)(3) does not place a statutory bar to the district court's grant of equitable relief that may result in a change of funding of the child's placement, or a modification of the placement.

The court further noted, "District courts have often granted preliminary injunctive relief with respect to special education placement or services under the Education for All Handicapped Children Act of 1975, after considering the existence of the prerequisites for such relief." *Id.* For example, in *Espino v. Besteiro,* 520 F.Supp. 905, 913 (S.D.Tex.1981), the court entered a pre-

---

**6.** The pertinent language states:

In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, *shall grant such relief as the court determines is appropriate.*

20 U.S.C. § 1415(e)(2) (emphasis added)

**7.** The *Walker* court found that Congress' lack of providing sanctions for a parent's removal of

her child from his current placement was compelling evidence that the statute was directory only.

**8.** See also *Cox v. Brown,* 498 F.Supp. 823, 828–29 (D.D.C.1980), where the court finds that the purpose of § 1415(e)(3) is "to protect children from any retaliatory action or from any disciplinary action not commensurate with the educators' need to protect the pupils in its system."

liminary injunction requiring the school district to dismantle the climate-controlled plexiglass box in which the child was formerly confined and provide the child with an air-conditioned classroom where he could interact fully with his peers—a "mainstreaming" measure. In *Cox v. Brown,* 498 F.Supp. at 828–29, the preliminary injunction required the placement of two children, at the government's expense, in two specific private schools; the court explicitly rejected the argument that 20 U.S.C. § 1415(e)(3) was a "statutory bar" to such an order "while this dispute is pending on the merits." *Id.* at 827. The court in *Cox* concluded:

> It defies comprehension to find congressional intent in this statute [§ 1415(e)(3)] which would result in the denial of equitable relief to the vulnerable in an instance when the plaintiffs have been able to demonstrate the substantial likelihood that the educational authorities have failed to comply with the mandates of the Act and where patent irreparable harm will occur absent prompt judicial relief.

*Id.*

We hold that in view of the congressional preference for maintenance of the current educational placement, a party that seeks to modify an existing educational placement, program or services must proceed by a motion for preliminary injunction. As with issues of funding interim placement, *see supra* at 917, the party seeking a modification of the status quo should bear the burden of proof. We caution, however, that this is a matter of *extraordinary* relief; we are not authorizing courts routinely to reevaluate or enforce the final state administrative decision regarding placement on a motion for preliminary injunction. Finally, the court's decision on these matters should explicitly set forth the findings of fact and conclusions of law that constitute the grounds for granting a preliminary injunction, as required by Federal Rule of Civil Procedure 52(a). *Accord, Stacey G. v. Pasadena,* 695 F.2d at 951.

## V.

The final issue before us is whether reimbursement of tuition costs expended is available to a prevailing party under § 1415(e)(2) and (e)(3). We turn again to *Town of Burlington,* 655 F.2d 428. In authorizing a preliminary injunction as the means for effectuating the (e)(3) directive we observed there that the record in that case contained "no demonstration of impending injury that final judgment, should it be in [plaintiff's] favor, would be unable to redress." *Id.* at 434. The plain inference is that reimbursement is an available remedy at final judgment. In contrast, however, our succeeding case of *Doe v. Anrig,* 692 F.2d 800, held that § 1415(e)(2) does not authorize reimbursement save in "exceptional circumstances." *Id.* at 812.

After a thorough reconsideration of the Act and the interests it seeks both to protect and to further, we must part company with the Seventh Circuit's constricted interpretation of the (e)(2) judicial powers, *see Anderson v. Thompson,* 658 F.2d at 1211, on which the *Anrig* opinion relied, and reaffirm the *Burlington* approach. Section (e)(2) not only creates a private right of action for aggrieved parties but also explicitly authorizes courts to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Plainly this authorizes a broad grant of equitable power designed to provide courts maximum flexibility in effectuating the statutory objectives. Moreover, because the Act is remedial in nature, we are charged with interpreting its provisions generously so to effectuate the important goals Congress intended to achieve. *See Gomez v. Toledo,* 446 U.S. 635, 639, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 268, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320 (1977); *McComb v. Super-A Fertilizer Works,* 165 F.2d 824, 826 (1st Cir.1948).

The Act's protections, of which (e)(2) is a part, were adopted in 1975 "to establish in law a comprehensive mechanism which will insure that those provisions enacted by the 93rd Congress will result in maximum bene-

fits to handicapped children and their families." S.Rep. No. 94–168, 94th Cong., 1st Sess., *reprinted in* U.S.Code Cong. & Adm. News at 1425, 1430 (1975). The rule we adopt here must seek to maximize those benefits within the statutory scheme created by Congress.

In *Anderson,* despite its holding that (e)(2) does not authorize "damages," 658 F.2d at 1211, the Seventh Circuit recognized two circumstances where damages equal to the cost of tuition may be allowed.

[First,] when a court subsequently determines that the services in dispute were necessary to protect the physical health of the child and also where services should have been provided by the school district the district court has the statutory authority to recompense parents for the cost of these services the school district failed to provide.

A second exceptional circumstance would exist when the defendant has acted in bad faith in failing to comply with the procedural provisions of section 615 in an egregious fashion.

*Id.* These exceptions must be based on the premise that § 1415(e)(2) is not a complete bar to reimbursement.

The Seventh Circuit is not alone in this construction. In cases before other federal courts the issue of reimbursement has arisen often, although generally subsequent to parental "self-help," that is, situations where parents have unilaterally moved their child to a private school pending review of the IEP because they are convinced the public placement is inadequate.[9] *See, e.g., Blomstrom v. Massachusetts Board of Education,* 532 F.Supp. 707 (D.Mass.1982). We need not decide today whether parental self-help constitutes a bar to reimbursement at final judgment; a divergence of opinion currently exists on this issue. *Compare id.* at 713–14 *with Doe v. Anrig II,* 561 F.Supp. 121, 129 (D.Mass.1983) (on remand), Nos. 83–1475, 83–1476 (1st Cir. argued Nov. 7, 1983). This issue is not properly before us.

Still, where these and other circumstances were sufficiently compelling, the court ordered reimbursement. *See William S. v. Gill,* 536 F.Supp. 505, 512 (N.D.Ill.1982); *Gregg B. v. Board of Education of Lawrence School District,* 535 F.Supp. 1333 at 1338–39 (E.D.N.Y.1982); *Blomstrom v. Massachusetts Board of Education,* 532 F.Supp. 707; *Foster v. District of Columbia Board of Education,* 523 F.Supp. 1142, 1150 (D.D.C.1981); *Tatro v. Texas,* 516 F.Supp. 968 (N.D.Tex.1981). We must conclude that the principle of reimbursement for tuition costs expended, at least in some circumstances, is fairly well established.

We join the Seventh Circuit in recognizing that the Act was a compromise between the needs of disabled children, the inherent difficulties in evaluating children with special needs, and the budgetary constraints facing local communities. We agree that

it would be incongruous for Congress to subject school systems to liability for damages each time a court disagreed with the school district's program while at the same time admitting the uncertainty of diagnosis in the field.

. . . .

... [A] general damage remedy would hinder rather than help the very children for whose benefit the statute was enacted.

*Anderson v. Thompson,* 658 F.2d at 1212, 1213. The Seventh Circuit, however, we respectfully observe, "failed adequately to note the difference between general damages, which could be a very serious matter, and reimbursement for tuition ...." *Doe v. Anrig II,* 561 F.Supp. at 127 (on remand) (Aldrich, J., sitting by designation).

We believe that the best approach to this issue is to require each party to bear the costs of its own errors of judgment in determining what a "free appropriate education" for a child requires in the pertinent circumstances. When parents become convinced that their child is not receiving an

---

9. Moreover, the child's needs may change and require accommodation prior to a school system's amendment of the IEP and authorized placement. *See e.g., Monahan v. Nebraska,*

645 F.2d 592 (8th Cir.1981) (during summer months, child with multiple disabilities newly confined to wheelchair; current placement school not wheelchair accessible).

appropriate education, the potential for reimbursement from the school system would encourage them to be assiduous in protecting their child's rights, yet the potential of having to repay the school system for a change to a private school would militate against impulsive or unfounded actions: a balance is struck. Similarly, the right to reimbursement would create the appropriate incentive for the local school committee. We do not impugn the conduct or dedication of these officials by recognizing that the expense of special education programs may perhaps, even unconsciously, lead them to be less than zealous in ensuring the child's right to a free and appropriate education. If school systems are forced to pay interim tuition eventually, however, greater incentive exists for making the initial placement the correct placement. *Blomstrom*, 532 F.Supp. at 11.

We conclude that permitting reimbursement promotes the purpose and policy of the Act. If the parents are incorrect in their claim that the IEP provides an inappropriate education for their child, they, like any other parents, should bear the financial burden of giving their child a private education. If the school committee's proposed public placement is held inappropriate, then through reimbursement all parties are restored to the position the Act sought to achieve.[10] In turn, "[f]or the successful parent to be left with what should have been the town's bill ab initio does not seem a municipal protection that Congress would have intended, however great the shortage of funds." *Doe v. Anrig II*, 561 F.Supp. at 127 (on remand). We therefore hold that reimbursement of tuition and related services is available to the prevailing party under the statutory authority of § 1415(e)(2).[11]

■ One final matter requires our consideration. The plaintiffs argue that because Brookline unilaterally terminated the child's tuition payments at the Carroll School without adequate notice, Brookline has forfeited its right to reimbursement. We think that serious procedural errors are grounds for denial of reimbursement. *See Lang v. Braintree School Committee*, 545 F.Supp. 1221, 1228 (D.Mass.1982). *See also Anderson v. Thompson*, 658 F.2d at 1214. *See generally Board of Education v. Rowley*, 458 U.S. at 205, 102 S.Ct. at 3050 (parents to be included in decisionmaking "at every stage" of the IEP and administrative process).

On remand, the district court, sitting as a court of equity, should first determine whether Brookline forfeited its right to reimbursement by unilaterally ceasing its tuition payments to the Carroll School. If the court so decides, the case ends there. If, however, the district court determines otherwise, a decision must be rendered on the validity of the contested IEP. Should the IEP be upheld, then the parents must reimburse Brookline for the fall term tuition paid to the School.

*Vacated and Remanded.* No costs to either party.

---

10. We add, for purposes of clarity, that when a district court by means of allowing or denying a motion for preliminary relief allows a child's education to proceed *pendente lite* in a particular school—so that school authorities pay either more or less than they might otherwise pay—this does not insulate the beneficiaries of the interlocutory injunction from the consequences of the final judgment in the case should it prove unfavorable to them. The right of the prevailing party to be reimbursed for school costs incurred because of an IEP or school enrollment found to be improper or unsanctioned is not limited by the fact that the same party was at first obliged to pay these costs under a preliminary injunction of the type we have described.

11. Because, on the facts of this case, the parents are not seeking reimbursement from the State, but, instead, the school committee is seeking reimbursement from the parents; the question whether the eleventh amendment is a bar to reimbursement does not arise. *Compare Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 776–77 (1st Cir.1981) (*dictum*) *with Parks v. Pavkovic*, 536 F.Supp. 296, 306–10 (N.D.Ill.1982) (Prentice Marshall, J.).